## In re EXCHANGE RESOURCES, INC., Debtor.

**Bankruptcy No. 96–35098.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Nov. 7, 1997.

William I. Kampf, Minneapolis, MN, for Debtor.

Kurt M. Anderson, Minneapolis, MN, for Claimant.

## ORDER RE: DEBTOR'S OBJECTION TO ADMINISTRATIVE–EXPENSE CLAIM OF OPUS CORPORATION (CLAIM NO. 266)

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the court for hearing on the Debtor's objection to a portion of the claim filed by Opus Corporation ("Opus") as Claim no. 266. The Debtor appeared by its attorney, William I. Kampf. Opus appeared by its attorney, Kurt M. Anderson. Upon the Debtor's objection, Opus's response, and the arguments of counsel, the Court makes the following order.

The Debtor filed a voluntary petition for relief under Chapter 11 on September 12, 1996. Before its bankruptcy filing, the Debtor was in the business of providing emergency backup and disaster recovery services for the data maintenance and storage operations of large financial institutions and brokerage houses. It conducted its operations at three leased locations. Among them was one at Minnetonka, Minnesota. Opus was the Debtor's landlord at Minnetonka, under a lease entered on January 30, 1990, and amended on October 23, 1990. This lease was to expire by its terms on January 30, 1997, though the Debtor had the right to renew it for an additional seven-year term by

giving notice to Opus at least 120 days before that date.

The Debtor's principals put it into bankruptcy realizing that it could not propose a confirmable plan under which it would continue as a going concern. The Debtor devoted the early months of the case, then, to stabilizing its reduced level of operations; entering into agreements with others in the industry, to continue service to its customers; and negotiating the sale of the several components of its business. The Debtor obtained confirmation of a liquidating plan on March 11, 1997, and has substantially consummated it since then.

When the Debtor went into Chapter 11, it was in arrears on its rental obligations to Opus in the sum of approximately $76,000.00. It then failed to timely make a rent payment to Opus that was due on October 1, 1996. In mid-October, 1996, Opus brought a motion for relief from the automatic stay of 11 U.S.C. § 362(a), seeking to enforce its contractual right to retake possession of the Minnetonka location. Several days after the service of the motion, the Debtor cured its post-petition rent default.

When the motion came on for hearing on October 22, the parties still were in contest over two demands that Opus was making— the first for an order permitting it to seek expedited, *ex parte* relief from stay on future default, and the second for an award of attorney fees. Via an order entered on October 23, 1996, the Court denied the former request. It did, however, order the Debtor to pay Opus the sum of $2,091.88, as reimbursement of the attorney fees Opus incurred in its effort to enforce the Debtor's duty of timely compliance under 11 U.S.C. § 365(d)(3). The order expressly reserved the issue of "Opus's right to recover reasonable attorney fees incurred in connection with this case after October 10, 1996."

Thereafter, the Debtor moved for an extension of the deadline under 11 U.S.C. § 365(d)(4) by which it had to assume or reject the lease, as well as an extension of the lease's deadline for exercising its option to renew.[1] Opus opposed both motions and

---

1. In making these motions, the Debtor was trying to maximize its potential recovery from the sale of the various parts of its business. At the time of the motions it was entertaining offers for its

its counsel briefed and argued the issues. Via an order entered on November 8, 1996, the Court extended the deadline for assumption or rejection to January 10, 1997, without prejudice to a request for a further extension, but denied the Debtor's request for an extension of the option. Several weeks later the Debtor moved for and was granted a further extension of the § 365(d)(4) deadline, without opposition from Opus. Ultimately Opus negotiated a new lease with Comdisco, the purchaser of the Debtor's assets at the Minnetonka location, which commenced after the Debtor's lease terminated on January 31, 1997.

On January 21, 1997, counsel for Opus filed a proof of claim, which was assigned no. 266 in the Court's records. Stating as the basis of its claim "Unpaid rents and costs," Opus asserted that the Debtor owed it $69,884.58 as an unsecured non-priority claim accrued pre-petition, and $9,504.60 as an unsecured priority claim. In the blank for designation of the source of the assertion of priority was the recitation: "Lease charges: Para 11.3, sec. 365(d)(3)."

The record now reveals that the "Lease charges" constituting the asserted priority claim are the attorney fees that Opus incurred for its participation in this case from October 11, 1996 through March 11, 1997. Opus has adjusted the amount claimed down to $8,819.83, but still maintains that it is entitled to recover all of these fees from the Debtor as a priority claim pursuant to the terms of its lease and 11 U.S.C. § 365(d)(3).[2] The Debtor strenuously objects to the allowance of this claim.[3]

■ The question, then, is whether a premises landlord's post-petition attorney fees are recoverable from the bankruptcy estate as part of the Debtor's duty of timely performance under § 365(d)(3), and to what extent.[4] In making the earlier award, the Court largely relied on the straightforward reasoning in *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978–979 (Bankr. W.D.Wash.1994):

> The legislative history to [§ ]365(d)(3) makes it clear that Congress intended a landlord to be fully paid during the first 60 days of the case while the Trustee or debtor in possession preserves the right to

---

operations as going concerns on their original sites. Alternatively, it was receiving offers for the bundles of customer relationships and other intangible attributes of the business, for consideration if no purchaser was interested in stepping into the active operations at their established locations. Because its operations required expensive, specially-configured, and technology-intensive physical installations, the best way for the Debtor to achieve maximum value for the former was to offer an ongoing right to possess the wired and equipped locations it had assembled during its growth.

**2.** In pertinent part, this statute provides:

> The trustee shall timely perform all the obligations of the Debtor, ... arising from and after the order for relief [in a bankruptcy case] under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding [11 U.S.C. § ] 503(b)(1).... The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period.... Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under [the Bankruptcy Code].

In turn, 11 U.S.C. § 503(b)(1)(A) provides for the allowance of administrative-expense claims for "the actual, necessary costs and expenses of preserving the [bankruptcy] estate ..."

**3.** The Debtor does not object to general unsecured component of Claim no. 266. As the Debtor's counsel correctly points out, Opus should have put the priority claim before the Court by motion, Loc.R.Bankr P. (D.Minn.) 3002–2(b), and not by filing a proof of claim. The use of the wrong procedure was addressed by changing the order of argument at hearing and the evidentiary burden from those that would otherwise apply under 11 U.S.C. § 502(a) and Fed.R.Bankr.P. 3001(f).

**4.** If they are, and remain unpaid after they are due, the landlord has a priority administrative-expense claim for them. *United States v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir.1994) (other party under executory contract with debtor in possession has priority administrative-expense claim if debtor has continued to receive benefits under contract pending its assumption or rejection pursuant to 11 U.S.C. § 365(a) and has not made payments required under contract). *Cf. In re Litho Specialties, Inc.*, 154 B.R. 733, 735 n. 2 (D.Minn.1993) (applying comparable reasoning in case involving lease of personalty).

assume the lease. The language of the statute itself is consistent with this intent. There are only three exceptions to the requirement that the trustee perform all obligations under the lease, those exceptions set forth in [§ ]365(b)(2), which are not applicable here. This Court therefore concludes that "all obligations" means just that. To the extent the Lease at issue here requires the payment of ... attorneys fees and costs, [the lessor] may recover those amounts.

*Id.* at 978–979 (footnote omitted). Under this rationale as long as the underlying lease gives a landlord the right to recover its attorney fees upon breach by a tenant-debtor, *In re Health Science Products, Inc.,* 191 B.R. 895, 913 (Bankr.N.D.Ala.1995), the landlord can recover the legal fees it incurs to enforce the debtor's timely performance under § 365(d), *In re MS Freight Distrib., Inc.,* 172 B.R. at 978–979.

Other courts have disagreed with *MS Freight Distrib.* and the cases on which it relies. They do so on at least three different rationales. *E.g., In re Pudgie's Dev. of N.Y., Inc.,* 202 B.R. 832, 836 (Bankr.S.D.N.Y.1996) (because § 365(d)(3) departs from the standard priority scheme of the Bankruptcy Code, it must be strictly construed; though the meaning of "timely performance" is unambiguous, as applied to rental obligation, it is ambiguous as to tenant's duty to reimburse landlord's attorney fees, and should not be held to mandate payment of claim under lease provision) *In re LCO Enterprises, Inc.,* 180 B.R. 567, 570–571 (9th Cir. BAP 1995), *In re South Bay Medical Assocs.,* 184 B.R. 963, 973 (Bankr.C.D.Cal.1995), and *In re Ryan's Subs, Inc.,* 165 B.R. 465, 468 (Bankr.W.D.Mo.1994) (lease provisions allowing landlord to recover attorney fees from tenant only contemplate actions under state law to enforce the lease's terms in nonbankruptcy forums; because litigation of landlord's rights under federal bankruptcy law is not contemplated by such provisions, landlord has no recoverable claim under lease or § 365(d)(3)); *In re Pacific Arts Publishing, Inc.,* 198 B.R. 319, 324 (Bankr.C.D.Cal.1996) (§ 365(d)(3) requires tenant-debtor's obligation to a landlord to arise "from and after the order for relief" in bankruptcy case; obli-

gation to reimburse attorney fees under prepetition lease does not do so, hence does not give rise to claim that is mandated for payment under § 365(d)(3) or that has administrative-expense priority). *See also, In re Gantos, Inc.,* 181 B.R. 903, 907–908 (Bankr. W.D.Mich.1995).

The problem with most of these cases is that they elide the unmistakable language of the statute, or ignore operative terms of the leases before them. Their tenor usually is that allowing the landlord's recovery of attorney fees under color of § 365(d)(3) offends the broad ethos of bankruptcy administration, as embodied in the general provisions of Title 11.

When these decisions try to build on this ambient and attenuated reaction, however, they stray from the clear Congressional intent. There is no question that § 365(d)(3) creates a constituency whose interests are given heightened protection in early stages of a bankruptcy case. One can disagree with this legislative classification as a political matter, and many have with some justification; however, when language as clear as "all the obligations of the debtor ... under any unexpired lease ..." is invoked by a landlord, the Bankruptcy Court's only appropriate function is to identify those obligations, as set forth in the lease, and then to enforce them in a means appropriate for that stage of the case and the administration of the estate. *In re MS Freight Distrib., Inc.,* 172 B.R. at 979; *In re Pacific Sea Farms, Inc.,* 134 B.R. 11, 14–15 (Bankr.D.Haw.1991).

This is why the Debtor here was ordered to promptly reimburse Opus for the attorney fees it had incurred up to October 10, 1996. The Debtor had failed to timely make its first post-petition rent payment; there was no assurance it would do so absent formal proceedings under the statute; Opus had to go to law to enforce its right to payment; and it did so within the 60–day period of § 365(d)(3). The lease itself provided, at its Para. 11.3:

If Tenant shall fail to perform any act required of it, Landlord may perform the same, ... and in exercising any such right to employ counsel and to pay necessary

and incidental costs and expenses, ... shall be deemed Additional Rent hereunder and, ... shall be payable to Landlord on demand or, at the option of Landlord, may be added to any monthly rental then due or thereafter becoming due under this Lease Agreement, ...

This text gave Opus the right to employ counsel to protect its interests in the wake of the Debtor's default in rent payments, to pass the cost of that employment onto the Debtor, and to require reimbursement of that cost "on demand" or not, at its discretion.[5] Opus made that demand, as part of its motion for relief from stay, and the Debtor came up with no meritorious argument against it. Reimbursement of those attorney fees being a lease obligation that ripened during the first 60 days of this case, then, it was part of the Debtor's duty of timely performance.

The courts that reject such a straightforward application of the statute often do so with an undercurrent of horror over the potential damage to the process of reorganization, or a more overt disdain for the perceived inequity of allowing one constituency to recover attorney fees from the bankruptcy estate when so many others may not. These courts *do* generally give lip service to the main mandate of § 365(d)(3): the reorganizing debtor's clear duty to live up to its monetary and nonmonetary covenants under an unexpired lease, pending its acceptance or rejection, and timely so. Their analysis falls short, however, in not recognizing the role that attorney-fee provisions have in furthering this main mandate. If the debtor does not default in a substantive lease covenant, its landlord has no cause to complain, and no basis for the commencement of proceedings under § 365(d)(3). This makes the accrual of such obligations wholly avoidable—by a simple compliance with § 365(d)(3). The imposi-

tion of such obligations, then, is a strong incentive for such compliance.

This highlights an inherent limitation on the pass-through of attorney fees, one that these decisions usually do not recognize. As a matter of nonbankruptcy law, premises leases almost invariably require a breach by the tenant before such provisions are activated. The recovery of attorney fees, then, is logically limited to those accrued in legal proceedings to address the breach. These provisions do not authorize a landlord to retain counsel at the tenant's expense just to monitor the tenant's business operations and options, or to assess the likelihood that the tenant will perform on the lease in the future. Nor do they authorize the landlord to do so to aid the landlord in re-letting the property to a different party after the lease term expires. If a landlord retains counsel under such circumstances, the resultant fees are chargeable to its own general cost of operations; they are in no way chargeable to a tenant that is not in default, absent very specific provisions in the lease.

In response to the Debtor's objection, Opus's counsel submitted a time-and-service recap to supplement the more cursory documentation attached to the proof of claim. The services itemized in it were rendered on, or for:

1. The final efforts on Opus's motion for relief from stay and the hearing on it;

2. Review of the status of the Debtor's motions on its other premises leases;

3. Attendance at the meeting of creditors in this case, review of the testimony given on behalf of the Debtor, and preparation of a summary of that testimony;

4. Review and response to the Debtor's motions for an extension of its option

---

**5.** This construction is by no means the only one possible. The quoted language could be read somewhat restrictively, to limit the recovery of attorney fees to situations where the Debtor was required to perform some sort of affirmative act relating to its tenancy; did not; Opus then did; and Opus had to hire counsel to try to make itself financially whole for the cost of its substituted performance. The only post-petition breach Opus litigated here was the Debtor's default in

rent payments. Opus does not aver that it substituted performance and paid itself. Logically, it would not have. An argument that the attorney-fee provision just did not apply to a simple rent default, then, was plausible under the rather stilted language of the lease. The Debtor did not make this argument, however. This decision presupposes, as it must, that Opus had a right to do what it did under the protection of a claim to reimbursement of its attorney fees.

to extend its lease with Opus and for an extension under § 365(d)(4);

5. Periodic review of the Debtor's status of currency in payment of post-petition rent and real estate taxes;

6. Review and response to the Debtor's motion for an extension of its deadline to assume or reject its lease with Opus;

7. Negotiations with Comdisco, the proposed successor tenant for the Minnetonka premises, with review and analysis of the economic and legal risks of entering a lease with it;

8. Preparation of Opus's proof of claim and, later, the beginning of the analysis on the claim objection at bar; and

9. Review of the Debtor's first plan and disclosure statement.

In their entirety, these services break out into two distinctive categories. One is compensable by the Debtor as a priority claim in favor of Opus and one is not.

■ The compensable one arises from the very last stages of Opus's motion for relief from stay. Though those services were indeed rendered after the Debtor cured its default, the circumstances justified Opus in proceeding to hearing. Opus's counsel had raised the issue of post-petition rent with the Debtor's counsel by a telephone call made a week before the first such payment was due. The Debtor nonetheless failed to pay. It was quite obvious that a motion was necessary to force the Debtors compliance.[6] Under the "on demand" provision of the lease, Opus had every right to seek the recovery of the attorney fees it had incurred on the motion to that point. Given the Debtor's record of delay and default, Opus was not out of bounds in pushing the issue of prompt reimbursement, or in seeking an order providing for expedited, *ex parte* relief from stay on a repeated default. Both of these points were prompted

by the first post-petition default, and both were directed toward ensuring the Debtor's future compliance. The attorney fees incurred in forcing them are recoverable under the lease; due again to the "on demand" provision, they became part of the Debtor's duty of timely performance. The Debtor received substantial benefit from its continuing occupancy of the Minnetonka location, during an extended period for evaluation of its choices of acceptance or rejection. To the extent the attorney fees remain unpaid, then, they give rise to a priority administrative-expense claim allowable and payable now.

■ However, this rationale does not apply to the remainder of Opus's asserted priority claim. This is so for one simple reason: once all of the issues raised by the motion for relief from stay had been resolved, the Debtor was current, and remained current, on its obligations under the lease. After that, Opus felt it necessary to continue its retention of counsel for this case. However, it had no contractual right to demand reimbursement from the Debtor for the cost of doing so. Because the term of the lease was near its end, Opus would have had to engage counsel for the services in relation to the new lease anyway. Para. 11.3 of the Debtor's lease could not possibly be construed to impose the cost of entering a new relationship on the departing tenant. The cost of Opus's legal evaluation of the Debtor's two motions, and its ongoing review of the case, were not expenses resulting from any default under the lease. The fee-shifting device of para. 11.3 had not been triggered. Opus has no claim to recover these costs from the Debtor, whether as a priority claim or a general one.

The detail furnished on the compensable services merits attributing 6.5 hours of attorney time to the effort.[7] At the rate of $140.00 per hour charged by both Anderson and Littlejohn, the expense attributable to

---

6. All of these findings were made on the record at the earlier hearing.

7. The components of this total are .80 hours spent by attorney Jaymes D. Littlejohn on October 11, 1996; 1.10 hours and 1.3 hours spent on October 16, 1996 by, respectively, Kurt M. Anderson and Littlejohn; and 1.3 hours and 2 hours spent by Anderson on, respectively, Octo-

ber 20 and October 22, 1996. The recap attributes 3.8 hours to Anderson's effort on October 22, for his review of cases relating to the attorney fee issue and his attendance at the hearing. Given the amount of time Anderson and Littlejohn had spent on the issue previously, the time is somewhat excessive and will be docked by 1.8 hours.

the 6.5 hours of their services is $910.00. With an adjustment already conceded by Opus and its counsel,[8] the final allowed amount of Opus's priority claim is $754.00. The balance of Opus's asserted priority claim cannot be allowed or recovered from the reorganized Debtor; it must bear any corresponding past expenditure as a general cost of doing business.

IT IS THEREFORE ORDERED:

1. The Debtor's objection to the administrative-expense component of the claim of Opus Corporation is sustained in part and overruled in part, as set forth in the remaining terms of this order.

2. Opus Corporation shall have an allowed claim in the sum of $754.00, with the priority of an expense of administration of the estate pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1), for the purposes of the distribution of the remaining assets in the possession of the reorganized Debtor.

3. The remainder of the administrative-expense claim asserted by Opus under proof of claim # 266 is disallowed, and Opus shall have no right of distribution under the Debtor's confirmed plan for any amount so asserted.

4. Within 15 days of the date of this order, the Debtor shall make distribution to Opus on account of the claim allowed under Term 2 of this order.

8. On page 2 of a "Declaration in Support of Administrative Priority Claim of Opus Corporation," counsel candidly acknowledged a "rate error as to KMA time on previously approved claim," and reduced the calculated total of Opus's current claim by $156.00. The amount of the previous overcharge and excess recovery is equally allocable to the present allowance, even if the amount finally allowed is far less than the aggregate sought by Opus.