**In re DENA CORP., an Illinois corporation, Debtor.**

**No. 03 B 35085.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 22, 2004.

John R. Hubeny, Law Offices of John R. Hubeny, Westmont, IL; Jerome F. Crotty, Maria E. Mazza, Rieck and Crotty, P.C., Chicago, IL, for Plaintiff.

David A. Golin, Gesas, Pilati, Gesas and Golin, Ltd., Chicago, IL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL ON PETITIONERS' ADMINISTRATIVE CLAIM

JACK B. SCHMETTERER, Bankruptcy Judge.

Dena Corporation, Inc. ("Dena Corp." or "Debtor") is a Debtor in this Chapter 11 proceeding. Royal American Bank and John R. Hubeny, individually, and Robert J. Hubeny, as Trustee, are assignees-lessors of a commercial lease entered into by Debtor. As Petitioners they seek an administrative claim for payment of rent default and related expenses asserted to have arisen under what they contend is a lease agreement. Debtors objected, the issues were tried, and the parties rested. Final argument was submitted in writing through filings of proposed Findings of Fact and Conclusions of Law.

### BACKGROUND AND PROCEDURAL HISTORY

Petitioners, Royal American Bank, as Trustee under Trust Agreement dated September 27, 2001, and known as Trust No. 10139, as assignee-lessor, and its beneficiaries John R. Hubeny, individually, and Robert J. Hubney, as Trustee under the Robert J. Hubeny Trust Agreement dated June 4, 1999 ("Petitioners") claim, pursuant to 11 U.S.C. § 503(b)(1)(A), payment from Debtor of priority administrative expenses ("Claim"). Petitioners also moved, pursuant to 11 U.S.C. § 362(d) to modify the automatic stay to proceed with eviction proceedings against Debtor ("Stay Motion").

The Debtor and certain secured creditors, namely Messers. Mahmoud Faisal Elkhatib, Dena Elkhatib, Maysoon M. Elk-

hatib, Hasan M. Elkhatib and Mary C. Kenna, and the Official Committee of Unsecured Creditors answered Petitioners' Claim and Petition. Petitioners replied. The Petitioners and the Debtor submitted a Joint Statement of Undisputed Facts. A trial on Petitioners' Claim and Petition was held on April 8–9, 2004.

On May 27, 2004 an Order was entered disposing of Petitioners' Stay Motion. The Order modified the stay and allowed Petitioners to proceed with eviction proceedings.

This matter was taken under advisement to determine if a commercial lease entered into by Debtor and assigned to Petitioners constitutes a "true lease" under 11 U.S.C. § 365(a). If so (as decided hereinbelow), Petitioners are entitled to rent and thereto entitled to an administrative claim under 11 U.S.C. § 503(b)(1)(A).

Based on the record and evidence, the court now makes and enters Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. An involuntary bankruptcy petition under Chapter 7 of Title 11 the Bankruptcy Code ("Code") was filed against Dena Corporation on August 25, 2003. (JS ¶ 1)[1] The Debtor previously sought relief under Chapter 11 of Title 11 of the Code in 2000.

2. The petition was converted into a voluntary Chapter 11 proceeding on September 23, 2003, pursuant to the Debtor's motion. (JS ¶ 2)

3. Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Code.

4. Debtor continues to operate its business from two buildings located on 825 and 850 Nicholas Boulevard, Elk Grove Village, Illinois (the "Property").

5. In 1986, Petitioner purchased the 850 Nicholas Building from Z.S. Frank, Trustee, pursuant to an Agreement for Sale and Purchase of Real Estate for a purchase price of $250,000. (Pet'r Exh. 1)[2]

6. Z.S. Frank, Trustee, conveyed the 850 Nicholas Boulevard property to Debtor by Trustee's deed. (Pet'r Exh. 1)

7. In 1989, Debtor purchased the 825 Nicholas Boulevard building from Mr. Julius Walton ("Walton") pursuant to a real estate sale contract for a purchase price of $370,000. (Pet'r Exh. 2)

8. The purchase of the 825 Nicholas Boulevard building from Walton completed a deferred exchange provision and the construction of a building on the 825 property. (Pet'r Exh. 3, 4)

9. Walton conveyed the 825 Nicholas Boulevard property to Hasan El Khatib ("El Khatib") by warranty deed. (Pet'r Exh. 5) El Khatib has at all times been Debtor's President and sole shareholder.

10. El Khatib financed the purchase of the 825 Nicholas Boulevard property through Bank Audi USA. El Khatib granted Bank Audi USA a Trust Deed on the property. (Pet'r Exh. 6)

11. El Khatib also granted Bank Audi USA an assignment of rents as additional security for the repayment of the loan secured by the Trust Deed. (Pet'r Exh. 7)

12. On January 15, 1993, El Khatib, individually, conveyed title to the 825 Nicholas Boulevard property to the Debtor

---

**1.** "JS" refers to the Joint Statement of Undisputed Facts signed and submitted by both parties on April 8, 2004.

**2.** "Pet'r Exh." refers to Petitioners' Exhibits admitted into evidence on April 8, 2004.

by Quit Claim Deed. (JS ¶ 13; Pet'r Exh. 8)

13. In September 1993, Debtor and Bank Audi USA executed a Modification and Extension Agreement to, *inter alia*, extend the term of the Bank Audi USA loan. (JS ¶ 14; Pet'r Exh. 9)

14. In January 1995, Debtor executed a Note for $1,000,000 payable to LaSalle Northwest National Bank ("LaSalle") and granted LaSalle a commercial mortgage on the property. (JS ¶ 15; Pet'r Exh. 10)

15. In December 1995, the commercial mortgage was modified, *inter alia*, to increase the debt to $1,200,000 by Debtor's execution of an amendment to the commercial mortgage ("First Amendment") (JS ¶ 16; Pet'r Exh. 11)

16. In January 1997, the commercial mortgage was again modified, *inter alia*, to increase the debt to $1,253,580 by Debtor's execution of a Second Amendment. (JS ¶ 17; Pet'r Exh. 12)

17. On January 14, 2000, Debtor filed a voluntary petition for relief under Chapter 11 ("Debtor's First Bankruptcy Case") (Case 00 B 01235). Debtor's First Bankruptcy case was assigned to Judge Doyle.

18. At the time of Debtor's First Bankruptcy case, the Debtor owed LaSalle approximately $1,800,000. (JS ¶ 19) As security for this debt, LaSalle held a mortgage on the Property and a security interest in Debtor's personal property, including machinery, equipment and receivables. (Pet'r Revised Findings of Fact ¶ 19)

19. In Debtor's First Bankruptcy case, LaSalle agreed to accept payment of approximately $1,533,000 in full settlement of its claim. (JS ¶ 20)

20. On August 24, 2000, in Debtor's First Bankruptcy case, Debtor filed a motion to sell real estate, enter into lease of premises, obtain credit from K & L Finan-

cial Inc and grant a priority security interest pursuant to 11 U.S.C. § 364 ("Omnibus Motion"). (JS ¶ 21; Pet'r Exh. 13)

21. In the Omnibus Motion, Debtor requested authorization to sell the property to a corporation owned by Mr. James Reger ("Reger"). Reger offered to purchase the Property from the Debtor for $850,000 and to lease it back pursuant to a commercial lease agreement. (JS ¶ 22)

22. In the Omnibus Motion, Debtor requested authorization to enter into a factoring and equipment accommodation to obtain credit from K & L Financial, Inc. for its working capital needs.

23. On September 11, 2000, in Debtor's First Bankruptcy case, Judge Doyle entered an Order Authorizing Debtor–In–Possession to Sell Real Estate, Enter into Commercial Lease of Premises and to Obtain Financing and Pay Off Secured Debt. (JS ¶ 24; Pet'r Exh. 14)

24. On September 27, 2000, Debtor's corporate attorney and corporate secretary was Stephen Levy ("Levy"). Debtor retained Levy to assist it in connection with its sale of the Property to Reger's corporation. (JS ¶ 25)

25. Reger obtained financing for his corporation's purchase of the Property through Royal American Bank. (JS ¶ 28)

26. Royal American Bank required an environmental assessment and an appraisal report on the Property as a condition of its loan to Reger's corporation. (JS ¶ 29)

27. Royal American Bank obtained an environmental assessment and an appraisal report on the Property. (JS ¶ 30; Pet'r Exh. 17, 18)

28. On November 29, 2000 Debtor closed the sale of the Property to Carpe Diem for a purchase price of $850,000 as allowed by Judge Doyle's Order of September 11, 2000. *See* Order Authorizing

Debtor–In–Possession to Sell Real Estate, Enter into Commercial Lease of Premises and to Obtain Financing and Pay Off Secured Debt, September 11, 2000, 00 B 01235.

29. On November 29, 2000, Debtor's sale of the Property to Carpe Diem was closed through escrow at Chicago Title and Trust Company. (JS ¶ 29; Pet'r Exh. 19)

30. Debtor conveyed the Property to Carpe Diem by warranty deed dated November 29, 2000. (JS ¶ 30; Pet'r Exh. 20)

31. Debtor entered into a commercial lease (the "Commercial Lease") with Carpe Diem with respect to the Property dated November 29, 2000. (JS ¶ 36; Pet'r Exh. 21)

32. Debtor, Carpe Diem and Royal American Bank entered into a Subordination, Attornment and Non–Disturbance Agreement dated November 29, 2000. (JS ¶ 38; Pet'r Exh. 22)

33. On or about November 29, 2000, Debtor and Triple L, Ltd., an Illinois corporation ("Triple L"), entered into an Equipment Lease Agreement. In connection with the Triple L Equipment Lease Agreement, Debtor, Carpe Diem and Triple L executed a Landlord's Waiver and Subordination Agreement for the Property. (JS ¶ 39; Pet'r Exh. 23)

34. On December 4, 2000, Judge Doyle entered another Order Authorizing Debtor–In–Possession to Sell Real Estate, Enter into Commercial Lease of Premises and to Obtain Financing and Pay Off Secured Debt which made provisions for the replacement of K & L Financial with Triple L as the entity to provide equipment and financing to Debtor. (JS ¶ 40; Pet'r Exh. 14)

35. On September 19, 2001, the Commercial Lease with Carpe Diem was recorded with the Cook County Recorder of Deeds. (JS ¶ 29; Pet'r Exh. 21)

36. On November 15, 2001, one of the Petitioners, Robert J. Hubeny, executed a commercial sales contract with Carpe Diem to purchase the Property from Carpe Diem for a purchase price of $787,500. (JS ¶ 42; Pet'r Exh. 24)

37. On November 15, 2001, Carpe Diem conveyed title to the Property to Petitioner Royal American Bank, as Trustee under Trust Agreement dated September 7, 2001, and known as Trust No. 101039 ("Trust No. 101039"), by Carpe Diem's Warranty Deed in Trust. (JS ¶ 43; Pet'r Exh. 25)

38. Petitioners John R. Hubeny, individually, and Robert J. Hubeny, as Trustee under the Robert J. Hubeny Trust Agreement dated June 4, 1999, are the sole beneficiaries of Trust 101039. (JS ¶ 42)

39. On November 15, 2001, at the time of the closing of Petitioners' purchase of the Property from Carpe Diem, Carpe Diem executed and delivered to Petitioners an Affidavit of Title, an Assignment of the Commercial Lease from Carpe Diem, a Closing Statement and a Bill of Sale. Petitioners also received a Commitment for Title Insurance from Attorneys' Title Guaranty Fund, Inc., Copies of the Affidavit of Title, Assignment of the Commercial lease, Commitment for Title Insurance, Closing Statement and Bill of Sale. (JS ¶ 42; Pet'r Exh. 26a, 26b, 26c, 26d, 26e, 27, 28 and 29)

40. On November 15, 2001, when Petitioners purchased the Property from Carpe Diem, Petitioners granted Royal American Bank a mortgage on the Property to secure repayment of a promissory note executed by Trust No. 101039. (JS ¶ 46; Pet'r Exh. 30)

41. On November 15, 2001, when Petitioners purchased the Property from Carpe Diem, Petitioners and Carpe Diem

notified Debtor that Petitioners purchased the Property from Carpe Diem. (JS ¶ 48; Pet'r Exh. 37)

42. After November 15, 2001, Debtor made payments to Petitioners denominated as rent and real estate tax payments due under the Commercial Lease through August, 2003. (JS ¶ 49; Pet'r Exh. 34)

43. On December 5, 2001, Debtor corresponded with Petitioner John R. Hubeny and stated that Debtor "confirms all of its rights and obligations under said lease." (JS ¶ 50; Pet'r Exh. 37)

44. On March 29, 2002, Debtor notified Petitioners through correspondence to John R. Hubeny, that Debtor was then choosing to exercise its option to purchase under the Commercial Lease. (JS ¶ 51; Pet'r Exh. 37)

45. On April 1, 2002, Petitioner John R. Hubeny sent correspondence to Debtor and advised Debtor that its obligation to pay rent continued until the sale of the Property closed. (JS ¶ 52; Pet'r Exh. 37)

46. Since September, 2003, Debtor has not paid the monthly rent and real estate tax payments to Petitioners. (JS ¶ 53; Pet'r Exh. 37)

47. Debtor did, however, pay $16,450 for the March, 2004 "rent" and real estate tax deposit pursuant to Court Order entered February 27, 2004. (JS ¶ 54)

48. Petitioners claim Debtor owes Petitioners $115,230 for unpaid rent and real estate taxes for the months of September, 2003 through April, 2004 ($16,460 × 8 months less $16,450 paid pursuant to February 27, 2004 Order) plus Petitioners' attorneys' fees and costs pursuant to Paragraph 18 of the Lease. (JS ¶ 55; Pet'r Exh. 21)

49. Debtor is required to maintain plate glass and public liability insurance, including bodily injury and property damages insuring Debtor, Petitioners Royal American Bank pursuant to Paragraph 11 of the Commercial Lease. (JS ¶ 56; Pet'r Exh. 21)

50. On or about October 23, 2003, Petitioners received a notice of cancellation of Debtor's insurance on the property. Accordingly, Petitioners obtained insurance to cover the Property at a cost of $1,284 on November 7, 2003 and $834.56 on January 23, 2004. (JS ¶ 57; Pet'r Exh. 38)

51. On December 11, 2001, Debtor signed its U.S. Corporation Income Tax Return to the Internal Revenue Service for the period ending February 28, 2001. On Schedule 4797 and on Line 8 of Form 1120, Debtor reported its sale of the Property as a disposition of property under Section 1245 of the Internal Revenue Code. (JS ¶ 59; Pet'r Exh. 42)

52. In its U.S. Corporation Income Tax Returns for the subsequent periods ending February 28, 2002, and February 28, 2003, Debtor reported its payment of rents for the Property as a rental deduction. (JS ¶ 60; Pet'r Exh. 43, 44)

53. In its Amended Operating Report for October 2003, filed January 9, 2004, Debtor stated the amount of delinquent payments due to Petitioners as of October 31, 2003, was $16,400. (JS ¶ 61; Pet'r Exh. 48)

54. In its Operating Report for November 2003, filed January 9, 2003, Debtor stated the amount of delinquent payments due to Petitioners as of November 30, 2003, was $32,800. (JS ¶ 62; Pet'r Exh. 48, 49)

55. In its Operating Report for December 2003, filed January 15, 2004, Debtor stated the amount of delinquent payments due to Petitioners as of December 31, 2003, was $49,200. (JS ¶ 63; Pet'r Exh. 48)

56. In its Operating Report for January 24, 2004, filed February 24, 2004, Debtor stated the amount of delinquent payments due to Petitioners as of January 31, 2004, was $65,600. (JS ¶ 64; Pet'r Exh. 48)

57. In its Operating Report for February, 2004, filed March 29, 2004, Debtor stated the amount of delinquent payments due to Petitioners as of February, 2004, was $98,400. (JS ¶ 65; Pet'r Exh. 48, 49)

58. Petitioners retained Rieck and Crotty, P.C. pursuant to a written fee agreement. (JS ¶ 67; Pet'r Exh. 49)

59. Rieck and Crotty, P.C. rendered services pursuant to the written fee agreement in connection with this dispute concerning the Commercial Lease. (JS ¶ 68; Pet'r Exh. 49)

60. Rieck and Crotty, P.C. and Jerome F. Crotty submitted a Fee Petition as ordered by the Court on April 19, 2004.

61. Facts stated in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and District Court Internal Operating Procedure 15(a). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and § 157(b)(2)(B) (allowance or disallowance of claims against estate). Jurisdiction therefore lies to enter final orders with respect to this Adversary proceeding.

### Issues

Debtor argues that the Commercial Lease is a financing transaction between it and the original lessor, Carpe Diem. According to Debtor, Carpe Diem purchased the Property specifically for its use and leased the Property back at rate determined by Debtor's indebtedness to Carpe Diem. The Commercial Lease is therefore asserted not to be a true lease for purposes of 11 U.S.C. § 365. Debtor's Summary of Argument at 4–5.

Petitioners disagree, contending that the terms of the Commercial Lease illustrate a typical landlord-tenant relationship.

### Standards for Determining a True Lease under Section 365

Labeling an agreement a "lease" does not necessarily make it one. Whether a lease is bona fide or merely a financing agreement depends on the circumstances of each case. *Marriott Family Restaurants, Inc v. Lunan Family Restaurants (In re Lunan Family Restaurants),* 194 B.R. 429, 450 (Bankr.N.D.Ill. 1996). Courts look the economic reality underlying a questioned agreement and not to the labels applied by the parties to determine the true nature of a transaction. *Liona Corp v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 198 (2d Cir.1986).

The threshold issue is how the agreement allocates risk of ownership (if a lease) or credit (if a form of loan). There cannot be a true lease where the "lessor" has no ownership interest at the end of the lease term. This is because the lessee has "effectively purchased the property through the mechanism of the lease, and so the lessee, not the lessor, has the benefit or burden of changes in the value of property when the lease terminates. Similarly, if the lease lasts for the economic life of the property being leased, the lessee, not the lessor, bears the risk of changes in value." *United Air Lines, Inc v. HSC Bank USA (In re UAL Corp.),* 307 B.R. 618, 632 (Bankr.N.D.Ill.2004) (holding that certain airport lease/leaseback transactions

**170**

are not true leases because in a true lease the leased property reverts to the lessor at the end of the lease term with substantial value remaining.)

In this case, the term of the "Commercial Lease" between the parties was for a fixed period of five years. At the end of this five year period, the Property was to revest in the lessor (or its assignee) and the lessor retained the ownership risk of changes in value of the property. That Debtor here does not have a surviving ownership interest strongly suggests that the Commercial Lease is a true lease.

■■■ Beyond the central issue of how an agreement allocates ownership risk, courts consider a variety of factors ordinarily associated with ownership rather than lessor status:

   (i) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment

   (ii) whether the [lessor's] purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction;

   (iii) whether the property was purchased by the lessor specifically for the lessee's use;

   (iv) whether the transaction was structured as a lease to secure certain tax advantages;

   (v) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance.

*Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.),* 155 B.R. 824, 838 (Bankr.N.D.N.Y. 1993). The *Syracuse* factors applied to

facts here indicate that the Commercial Lease in this case was an ordinary lease.

First, the weight of evidence did not show that the rental payments were structured for some purpose other than to compensate the lessor. Debtor argued that the rental payments were calculated based on the amount that Carpe Diem, the original lessor, owed to its lender. But Debtor failed to prove this theory by the preponderance of evidence.

■■■ Second, the Commercial Lease provided Debtor with the option to purchase the property for $850,000. Pet'r Exh. 21, Commercial Lease ¶ 14. But the fact that the purchase option is not nominal or token suggests a customary lease with options to buy at the end. *See In re Hardy,* 146 B.R. 206, 209–210 (Bankr.N.D.Ill.1992) (holding that a nominal purchase price suggests a disguised secured transaction rather than a lease.)

Third, although this is a sale/leaseback transaction, Debtor produced no persuasive evidence that the lessor purchased the Property for its use. In fact, the short lease term suggests otherwise.

Fourth, Debtor's tax returns for 200, 2001, and 2002 do not indicate that Debtor gained any type of tax advantage from the sale and leaseback of the Property. *See* Pet'r Exh. 42–44.

Fifth, the terms of the Commercial Lease imposes obligations and confers rights typical of those arising out of an ordinary landlord-tenant relationship. Debtor insists that the Commercial Lease required it to assume some obligations associated with ownership, including the maintenance of plate glass, electrical wiring, plumbing and heating installations, all repairs including the roof, exterior walls and structural foundation, and payment of all utility charges, insurance and real estate taxes. Debtor's Summary of Argu-

ment at 4–5. However, these obligations are indicative of some normal landlord-tenant relationships. Furthermore, the Commercial Lease does impose limits on Debtor's occupancy and rights, including imposing conditions on the use of the premises; requiring the lessors' consent for improvements and additions to the premises; prohibiting assignment and subletting without the lessors' consent; and requiring the lessor to comply with applicable state and local laws. Pet'r Exh. 21, Commercial Lease.

Based on the foregoing, it is concluded that the Commercial Lease is a true lease under 11 U.S.C. § 365.

### Administrative Claims

Debtor defaulted on post-petition monthly rent, real estate tax, and insurance premium payments as required by the Commercial Lease. Debtor owes Petitioners rent and real estate taxes for the months of September, 2003, through April, 2004 ($16,460 × 7 months), plus the insurance premiums paid by Petitioners ($2,118.56), and attorneys fees ($44,420.74) totaling $161,759.30. Petitioners asserts that this total amount is entitled to administrative expense priority.

■■ Administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources that will be equally distributed among creditors. *See In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir.1988). In order to demonstrate the priority of an administrative claim, the debt must (1) arise out of a transaction with the debtor-in-possession and (2) benefit the operation of the debtor's business. *In re Jartran, Inc.*, 732 F.2d 584, 586–7 (7th Cir.1984). (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)).

■■ Petitioners' total claim will not receive administrative expense priority. The Commercial Lease was rejected in December 2003. Petitioners will be granted an administrative expense for the period before rejection that the rent and tax escrow payments were due, October 1, November 1, and December 1, 2003. These payments total $49,380 ($16,460 × 3 months).

The rental payment for September 1, 2003 through September 23, 2003 arose while Debtor's bankruptcy case was involuntary and before conversion of Debtor's bankruptcy petition to Chapter 11. This payment of $16,460 will be entitled to administrative expense priority pursuant to Section 507(a)(2). *See* 11 U.S.C. §§ 502(f), 507(a)(2).

■■ Petitioners requests attorneys fees in the amount of $44,420.74 as an administrative expense. Debtor objects to any award of attorneys fees contending that since the lease was rejected in December 2003, there is no basis to allow such fees as administrative expenses. Debtor's Objection to Findings of Fact ¶ 12 at 6.

The Commercial Lease provides:

18. Attorneys Fees: In case suit should be brought for recovery of premises, or for any sum due hereunder, or because of any act which may give arise out of the possession of the premises, by either party, the prevailing party shall be entitled to all costs incurred with such action, including a reasonable attorney fee. Pet'r Exh. 21, Commercial lease ¶ 18.

This provision gave Petitioners the right to employ counsel to protect its interests in the event of Debtor's default and to pass the cost of that employment onto the Debtor. Cases appear to award attorney fees administrative expense status if they are permitted by the lease agreement and in-

curred prior to rejection. *See, e.g., In re Exchange Resources,* 214 B.R. 366, 370 (Bankr.D.Minn.1997). However, the attorneys fees incurred in this matter arose after rejection of the lease. Also, those fees benefitted Petitioners but not the subject property. They will be allowed as a claim but not awarded administrative priority status.

However, insurance premiums totaling $2,118.56 kept the property protected, thus benefitting the Debtor's business and qualifying as an administrative expense.

Finally, Petitioners hold Debtor's security deposit of $25,000 for the Property. Petitioners's administrative expense will be reduced by this amount. Debtor will be awarded $42,958.56 in administrative expenses ($49,380 + $16,460 + $2,118.56–$25,000).

### CONCLUSION

Judgment will be entered separately that allows Petitioners' claim consistent with the foregoing Findings and Conclusions.