**In re NATIONAL STEEL CORP. et al., Debtors.**

**Bankruptcy No. 02 B 08699.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 26, 2004.

**292**

Kurt M. Carlson, Esq., Chicago, IL, Ralph E. McDowell, Esq., Detroit, MI, for Movant.

Mark A. Berkoff, Esq., Chicago, IL, for Respondent.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of Hayes–Lemmerz International, Inc. (the "Creditor") for allowance and payment of a Chapter 11 administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) from the bankruptcy estates of National Steel Corporation and its related debtor entities ("National Steel"). For the reasons set forth herein, the Court denies the motion.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

### II. FACTS, BACKGROUND AND TESTIMONY ADDUCED AT TRIAL [1]

The Creditor is a Delaware corporation with its principal place of business located in Northville, Michigan. Proposed Findings from Creditor at ¶ 1; Proposed Findings from National Steel at ¶ B. The Creditor operates several manufacturing facilities, including a steel wheel manufacturing plant in Sedalia, Missouri. Trial Tr. at 13. The Creditor manufactures and sells wheels for use on passenger vehicles and light trucks to original equipment manufacturers in the automotive industry ("OEMs"), such as the Creditor's major customers, Ford Motor Company ("Ford") and General Motors Corporation ("GM"). Id. at 14, 16. On December 5, 2001, the Creditor filed a voluntary Chapter 11

---

1. National Steel submitted 44 exhibits and the Creditor submitted 17 exhibits, all of which were admitted into evidence. The majority of these exhibits was not referenced in either the pre-trial or the post-trial submissions. Moreover, only a handful of those exhibits was mentioned during the trial. The parties failed at all stages of this litigation to point out the significance of the majority of these exhibits. It is not the job of this Court to sift through the parties' exhibits to determine the relative significance and importance of each document to their respective positions. As the Seventh Circuit Court of Appeals has stated, " '[j]udges are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir.2002), *cert. denied*, 539 U.S. 941, 123 S.Ct. 2606, 156 L.Ed.2d 626 (2003) (*quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)).

bankruptcy petition in Delaware.[2] *Id.* at 30.

At all times relevant to the instant motion, National Steel was a Delaware corporation with its principal place of business located in Mishawaka, Indiana. Proposed Findings from National Steel at ¶ A. National Steel supplies steel to entities like the Creditor. Trial Tr. at 14. National Steel was the Creditor's supplier for large volumes of certain, specialized steel from which it fabricated the wheels for the OEMs. *Id.* at 22.

In the automotive industry, suppliers like the Creditor that provide component parts to OEMs are referred to as "Tier 1" suppliers. Proposed Findings from Creditor at ¶ 5. Suppliers like National Steel that provide products to Tier 1 suppliers are commonly referred to as "Tier 2" suppliers. *Id.* OEMs require that all parts supplied by Tier 1 suppliers meet certain specifications for quality, durability and safety. Trial Tr. at 20. To that end, a Tier 1 supplier must go through a lengthy testing and approval process for each part that it supplies to an OEM. *Id.* at 20–21. This process is commonly known as the "pre-production approval process" or "PPAP." *Id.* The PPAP is particularly stringent when the Tier 1 supplier is providing a "safety critical" part to the OEM. *Id.* In that situation, the materials that the Tier 1 supplier buys from the Tier 2 supplier for use in the safety critical part must also be tested and approved through the PPAP. *Id.* at 21. The PPAP can take anywhere from six to twelve months. *Id.* Wheels for use on passenger vehicles and light trucks are considered safety critical parts. *Id.* at 20, 25; Gonzales Dep. at 27. For that reason, a Tier 1 supplier like the Creditor that supplies a steel wheel to an

OEM like Ford or GM must include in its PPAP the testing and approval of all of the steel supplied by the Tier 2 supplier like National Steel for the manufacture of the wheel. Proposed Findings from Creditor at ¶ 8.

Typically, OEMs do not maintain any significant reserve on hand or inventory of component parts like wheels. Trial Tr. at 25. Thus, Tier 1 suppliers are required to supply parts to OEMs on a "just in time" basis. *Id.* The failure on the part of a Tier 1 supplier to deliver those parts on time to an OEM can cause a host of problems for both the Tier 1 supplier and the OEM, including a slowdown or halt in the production of vehicles, which can have a devastating financial impact on both parties. *Id.* at 26–28. The shutdown of an automotive plant can be catastrophic for a Tier 1 supplier. Salliotte Dep. at 23. Further, an OEM whose Tier 1 supplier causes it to slow or halt production may impose backcharges against it and refuse to award future contracts to that supplier. Trial Tr. at 26. Such a loss of current and future business can financially ruin a Tier 1 supplier. *Id.*

In the event that a Tier I supplier fails to deliver parts, an OEM may "off-line" vehicles or install certain "slave" wheels on vehicles until the proper parts are delivered, in lieu of halting production. *Id.* at 26–27. In the event an OEM slows or halts production, it can incur significant damages as a result of its inability to produce vehicles. *Id.* at 26–29. If such a situation occurs, the OEM may seek reimbursement from the Tier 1 supplier whose failure to deliver parts caused the OEM to slow or halt production. *Id.* In fact, in 2002, the Creditor was required to pay

---

**2.** In June 2003, the bankruptcy court in Delaware confirmed the Creditor's Chapter 11 plan of reorganization. Trial Tr. at 92.

Ford approximately $3,000,000.00 as the result of its failure to make timely delivery to Ford. *Id.* at 27–29.

It is undisputed that the Creditor and National Steel had a multi-year history of annual supply contracts under which National Steel sold steel to the Creditor that the Creditor then used to manufacture wheels for its OEM customers. On October 25, 2001, National Steel provided the Creditor with a Price Proposal and Supply Guidelines for 2002 (the "Price Proposal") for the sale of steel from National Steel to the Creditor for the period from January 1, 2002 through December 31, 2002. Creditor Ex. No. 1. The Price Proposal quoted prices and payment terms for the sale of steel. *Id.* Pursuant thereto the Creditor delivered Purchase Order No. 276913 (the "Purchase Order") to National Steel in response to the Price Proposal. Creditor Ex. No. 2. The Purchase Order: (1) described the particular steel that the Creditor intended to purchase from National Steel during the duration of the Price Proposal; (2) identified the unit price for each particular type of steel that the Creditor intended to purchase from National Steel during the duration of the Price Proposal; and (3) provided that "[t]he terms and conditions applicable to this purchase order are those terms and conditions in effect on the date of this purchase order and located on the company's web site, www. Hayes-Lemmerz.com." (the "Terms and Conditions"). *Id.;* Trial Tr. at 24.

Paragraph 2 of the Terms and Conditions, in turn, stated in relevant part that "[t]he Purchase Order is the entire agreement between the Parties respecting the Products and no modification of the Purchase Order shall be effective unless in writing and signed by an authorized representative of [the Creditor]...." National Steel Ex. No. 5 at ¶ 2. Further, paragraph 3 of the Terms and Conditions provided as follows:

Any [National Steel] Document (including any [National Steel] Document referenced in the Purchase Order), to the extent containing any terms in addition to or inconsistent with the terms of the Purchase Order, or a rejection of any terms of the Purchase Order, shall be deemed to be a counter offer to [the Creditor] and shall not be binding upon [the Creditor] unless specifically accepted in writing by an authorized representative of [the Creditor]. In the absence of written acceptance of such counter offer by [the Creditor], commencement of performance by [National Steel] shall be deemed to be an agreement by [National Steel] to perform in accordance with the terms of the Purchase Order and an acceptance hereof, notwithstanding any prior dealings or usage of trade.

*Id.* at ¶ 3.

The Terms and Conditions also spoke to the price and terms for the purchase of the steel, stating in pertinent part:

[The Creditor] shall not be billed at prices higher than stated on the Purchase Order unless authorized by an amended Purchase Order issued and signed by an authorized representative of [the Creditor] in accordance with Section 2. [National Steel] represents that the prices and terms for the Products covered by the Purchase Order are no less favorable to [the Creditor] than [National Steel] currently offers to any other customers for the same or similar Products in similar quantities. [National Steel] agrees that any price reduction made in Products of the type covered by the Purchase Order subsequent to the placement of the Purchase Order shall be applicable to the Purchase Order. [National Steel's] price shall not exceed the lowest prevailing market price, and

in no event is the Purchase Order to be filled at prices higher than the last previously quoted or charged prices by [National Steel], whichever is lower, without [the Creditor's] prior written consent. . . .

*Id.* at ¶ 7.

Additionally, the Terms and Conditions addressed the possibility of default and the remedies available thereunder:

Upon any default hereunder, in addition to all other remedies hereunder or under applicable law or in equity, [the Creditor] may exercise any one or more of the following remedies: . . . (e) recover from [National Steel] any and all increased costs and other damages relating to such default and (f) recover attorneys' fees and costs of suit, plus interest on all of the foregoing at the highest rate permitted by applicable law. No delay by [the Creditor] in the enforcement of any provision of the Purchase Order shall constitute a waiver thereof,

and no waiver thereof shall constitute a waiver of any other provision.

*Id.* at ¶ 14.

Finally, regarding the applicable choice of law, the Terms and Conditions provided in relevant part that "[t]he Purchase Order shall be construed according to the laws of the state of Michigan and the federal laws of the United States of America . . . notwithstanding any choice of law provisions that would otherwise require application of any other law." *Id.* at ¶ 26(a).[3]

It is undisputed that the Price Proposal, Purchase Order, and Terms and Conditions created a contract (the "Contract") between the parties from January 1, 2002 through December 31, 2002.[4] From January 1, 2002 through March 5, 2002, the parties performed under the Contract. The Creditor ordered steel from National Steel, and National Steel delivered steel to the Creditor pursuant to the Contract. However, shortly after the Creditor filed

---

**3.** The Court must determine the applicable law that governs the Creditor's administrative claim which is premised on the Contract (defined hereinafter) and National Steel's alleged breach thereof. Contractual choice of law provisions are generally enforceable assuming that they are reasonable. *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 846 (7th Cir. 1999); *Kuehn v. Childrens Hosp., L.A.*, 119 F.3d 1296, 1301 (7th Cir.1997). A court will apply a contract's choice of law clause to disputes that arise from that contract, so long as the contract is valid. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir.1996); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill.2d 325, 351, 264 Ill.Dec. 283, 770 N.E.2d 177, 194 (2002) ("Generally, choice of law provisions will be honored."). Traditionally, the law applicable to a contract is that which the parties intended. *See Wabash, Inc. v. Avnet, Inc.*, 516 F.Supp. 995, 998 (N.D.Ill.1981); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39, 42 n. 3 (N.D.Ill.1970). When that intent is expressed, it should be followed. *Reighley v. Cont'l Ill. Nat. Bank & Trust Co.*, 390 Ill. 242, 249, 61 N.E.2d 29, 33 (1945).

Neither party contests the validity of paragraph 26(a) of the Terms and Conditions. Based on this language, the Court finds that the parties clearly intended the choice of law provision to broadly apply to all disputes arising out of their agreement, including the dispute at bar. Accordingly, the Court defers to the parties' choice of law provision and will apply Michigan law to the instant dispute where relevant and applicable.

**4.** National Steel concedes in its Proposed Findings of Fact and Conclusions of Law that a pre-petition contract was formed between National Steel and the Creditor for the sale of steel because National Steel offered the Price Proposal to the Creditor; the Creditor delivered the Purchase Order, which contained the Terms and Conditions, to National Steel in response to the Price Proposal; and the parties operated in accordance with the terms of the Price Proposal and Terms and Conditions for several months prior to the filing of National Steel's bankruptcy petition.

bankruptcy in December 2001, National Steel refused to ship any more product to the Creditor unless it was willing to pay for those steel shipments in advance rather than according to the payment terms of net 45 days under the Contract. Trial Tr. at 30–31.

On March 6, 2002, National Steel filed voluntary Chapter 11 petitions.[5] In April 2002, the Creditor was aware of the possibility that National Steel would not continue to supply it with steel beyond the December 2002 Contract expiration date. National Steel Ex. No. 28; Trial Tr. at 77–79. On April 30, 2002, in an internal communication, the Creditor acknowledged that National Steel might not be supplying steel to its Sedalia plant in 2003. National Steel Ex. No. 28. Furthermore, on June 11, 2002, in another internal communication, the Creditor revealed that another Tier 2 supplier, International Steel Group, Inc. ("ISG"), would not be required to go through the "formal PPAP" because the Creditor had ordered steel from ISG in the past twelve months. National Steel Ex. No. 23. Additionally, in a June 20, 2002 internal communication, Charles Brown ("Brown"), the individual responsible for the global procurement of steel for the Creditor, suggested to Michael Edie ("Edie"), vice president of global purchasing and logistics for the Creditor, that the Creditor, among other things, "[p]lace 100% of our requirements with ISG." National Steel Ex. No. 27; Trial Tr. at 13, 90.

In fact, on April 12, 2002, Rouge Steel Company provided the Creditor with a price quotation for hot-rolled pickled and oiled slit steel coils for delivery to Sedalia. National Steel Ex. No. 33. The duration of the quote was from July 1, 2002 through December 31, 2002. *Id.* In addition, on May 20, 2002, United States Steel Corporation sent the Creditor a price quote for hot-rolled pickled steel valid for the year 2002 for delivery to Sedalia, National Steel Ex. No. 34, which was subsequently revised on June 6, 2002, National Steel Ex. No. 36. Moreover, on July 1, 2002, ISG provided the Creditor with a price quotation for hot-rolled band steel for the Sedalia plant. National Steel Ex. No. 24. Pursuant to this quote, the prices stated were effective with shipments for the period August 1, 2002 through December 31, 2003. *Id.*

Shortly after National Steel filed bankruptcy, several meetings took place between representatives from National Steel and the Creditor wherein National Steel informed the Creditor that it would be seeking a price increase for the purchase of steel under the Contract. Trial Tr. at 31–35, 40, 82, 87–88, 91–99. National Steel informed the Creditor that without the price increase, it could not and would not continue to ship the volumes of steel that it had been shipping to the Creditor. *Id.* at 33–34.

However, National Steel denies that it ever directly threatened to cease shipping steel to the Creditor if it failed to pay the increased price. Salliotte Dep. at 41–42; Gonzales Dep. at 35–36.

The Creditor concedes that National Steel never directly threatened to cease

---

5. On April 21, 2003, the Court entered an order approving the sale of substantially all of National Steel's assets to United States Steel Corporation. Thereafter, on October 23, 2003, the Court confirmed the first amended plan of reorganization which became effective on December 19, 2003. On the plan's effective date, the Official Committee of Unsecured Creditors was dissolved, and the Unsecured Creditors' Representative was formed for purposes of representing the interests of holders of general unsecured claims. The Unsecured Creditors' Representative joins National Steel's opposition to the Creditor's administrative claim request.

shipping steel to the Creditor. Trial Tr. at 35, 62, 82–83, 132, 136. In fact, on October 10, 2002, in a draft letter [6] authored by Brown that was addressed to Manuel Tod Gonzales, Jr. ("Gonzales"), general manager of automotive sales at National Steel, Brown wrote that "National [Steel] has continued to verbally state you will not discontinue shipments to [the Creditor]" and "[a]lthough National [Steel] has not made any 'direct threats,' we believe there have [sic] been implied action. . . ." National Steel Ex. No. 19; Trial Tr. at 62–66; Gonzalez Dep. at 6. Based on various communications with representatives from National Steel, however, the Creditor had concerns that National Steel would discontinue shipping the steel. Trial Tr. at 143–45. Specifically, Brown was told by William Salliotte ("Salliotte"), manager of National Steel's supplier group, which included the Creditor and the point person responsible for managing the Creditor's account with National Steel, when asked whether National Steel would continue to ship steel: "No, I am not going to shut you off today. However, the . . . final decision is not in my hands." *Id.* at 35; Salliotte Dep. at 4, 7–8.

On September 27, 2002, National Steel delivered an amended price proposal for the sale of steel to the Creditor (the "Amended Price Proposal") for the period October 1, 2002 through December 31, 2002. Creditor Ex. No. 7; National Steel Ex. No. 43. The terms of the Amended Price Proposal were different from those in the original Price Proposal in that National Steel increased the purchase price for the steel by eighteen percent and included freight and appropriate fuel surcharges. *Id.* The Amended Price Proposal stated in relevant part that "a decision has been rendered to amend the current transaction prices previously extended to [the Creditor]. The amendments to the previous agreement include a revision to the timeframe and the transaction price." *Id.* On October 14, 2002, National Steel sent the Creditor a letter that outlined the price revisions and stated that the increased prices would be effective and retroactive to the October 1, 2002 invoiced shipments. National Steel Ex. No. 1.

It is undisputed that from October 2002 through December 31, 2002, the Creditor purchased steel from National Steel and paid for the steel at the higher rates as set forth in the Amended Price Proposal. According to Brown, the decision to pay the price increase imposed by National Steel was made in order to protect the Creditor's customers and to prevent financial devastation to the Creditor's business. Trial Tr. at 26–29, 99–100.

The Creditor vehemently denies that it ever agreed to the price increase. *Id.* at 69, 96, 104, 138, 145. Indeed, an internal e-mail message at National Steel confirms the Creditor's disagreement over the price increase. Creditor Ex. No. 8. In fact, in furtherance of the Creditor's position that the price increase amounted to a breach of the Contract, on November 5, 2002, Edie sent National Steel a letter wherein he advised that the Creditor would pay the increased price for the steel but that the increase was not appropriate under the Contract. Creditor Ex. No. 10; Trial Tr. at 100–01. Specifically, the November 5, 2002 letter stated in relevant part:

> [T]he increase is not appropriate under our current contract with National [Steel]. We are in receipt of a debit memo that reflects the proposed increase. I have authorized the Sedalia plant to increase the deposit balance we carry at National [Steel] while we are

6. The letter written by Brown was never sent to Gonzales.

trying to resolve this matter to insure uninterrupted supply.

Creditor Ex. No. 10.

Edie testified that several days after he sent the letter, he received a telephone response from Scott J. Montross ("Montross"), vice president of sales for National Steel. Trial Tr. at 101–02. Montross inquired about the meaning of the above quoted paragraph, and Edie informed him that he considered the price increase to be a breach of the Contract, but that the Creditor had no other choice but to pay the increase in order to ensure uninterrupted supply to its OEMs. *Id.* at 102; *see also* Gonzales Dep. at 31. Edie further testified that he told Montross that the Creditor was reserving its rights and would evaluate the situation. Trial Tr. at 102. Edie stated that the November 5th letter demonstrated the Creditor's disagreement about the price increase and constituted a reservation of its rights under the Contract. *Id.* at 100–04.

Salliotte testified that Edie, in a voicemail message to him, agreed to the increased price because he had no other choice. Salliotte Dep. at 37–38, 57, 60. In addition, Salliotte testified that the Creditor agreed to the increased price reflected in the Amended Price Proposal because the Creditor's purchase orders reflected the increased price. *Id.* at 39. Gonzales also testified that Edie disagreed with the price increase, but stated that he was compelled to pay. Gonzales Dep. at 31, 34–35.

The Creditor asked National Steel for reasons for the increase in the price for the steel, but National Steel never provided the Creditor with any justification. Trial Tr. at 99. According to National Steel, the price for steel contained in the Contract between it and the Creditor was below the market rate. Salliotte Dep. at 51, 67; Gonzales Dep. at 17. Gonzales testified that multiple factors resulted in marketplace changes, which, in turn, caused the increase in the cost of steel. Gonzalez Dep. at 17–20. These factors included numerous steel companies filing bankruptcy, as well as tariffs imposed by federal law on foreign steel companies in order to assist the domestic steel industry. *Id.* Gonzales further stated that National Steel could have sold the steel allocated for the Creditor to other Tier 1 suppliers at the higher price. *Id.* at 20–22.

From the period October 25, 2002 through December 2002, National Steel sent invoices to the Creditor for the sale and purchase of steel at the higher price reflected in the Amended Price Proposal. Creditor Ex. No. 9; National Steel Ex. No. 43. The Creditor did not issue a new or revised purchase order with respect to the price increase imposed by National Steel under the Amended Price Proposal. Trial Tr. at 41, 104–05. Pursuant to an analysis performed by the Creditor and stipulated to by National Steel, the Creditor paid National Steel $1,106,351.54 more for the steel purchases under the Amended Price Proposal than it would have paid under the original Price Proposal. Creditor Ex. No. 13.

The Price Proposal expired by its own terms on December 31, 2002. It is undisputed that National Steel never assumed or rejected the Contract as an executory contract under 11 U.S.C. § 365(a). Moreover, the Creditor never sought relief under 11 U.S.C. § 365(d)(2) to compel National Steel to decide within a specified time whether to assume or reject the Contract as an executory contract. Further, it is undisputed that the Creditor never sought any relief from the price increase either before the court in Delaware, where the Creditor had filed a Chapter 11 petition, or before this Court in National Steel's bankruptcy case. Trial Tr. at 133, 146.

On November 7, 2003, the Creditor filed the instant motion for allowance and payment of a Chapter 11 administrative expense. The Creditor alleges that National Steel breached the Contract by demanding that the Creditor pay for steel in advance and at a price higher than required under the Contract. Further, the Creditor alleges that its post-petition purchase of substantial amounts of steel at the higher prices benefited National Steel and its estate. Specifically, the Creditor contends that it has an administrative claim comprised of four components: (1) the $1,106,351.54 that it overpaid above the set Contract rates for the steel; (2) $322,346.00 in finance charges it incurred in order to make those payments; (3) interest under the Contract; and (4) its attorneys' fees and costs pursuant to the Contract.

## III. *DISCUSSION*

### A. *Whether the Creditor's Claim Should Be Afforded Administrative Expense Status*

■ Section 507(a)(1) of the Bankruptcy Code grants first priority in the distribution of the assets of a bankruptcy estate to administrative expenses allowed under 11 U.S.C. § 503(b). 11 U.S.C. § 507(a)(1); *see also In re Mich.-Wis. Transp. Co.*, 161 B.R. 628, 632 (Bankr.W.D.Mich.1993) (noting that allowed administrative expenses are paid ahead of all other types of priority claims, as well as general unsecured claims). An administrative expense claim is governed by § 503(b), which provides in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A). Although this section does not completely define "necessary costs and expenses," the word "including" is not limiting. *In re CIS Corp.*, 142 B.R. 640, 642 (S.D.N.Y.1992). Preservation of the estate may include the continuation or liquidation of a debtor's business. *Reading Co. v. Brown*, 391 U.S. 471, 475, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). To afford administrative expense priority to expenses that are not necessary to the preservation of the estate conflicts with the goals of the Bankruptcy Code. *See CIS Corp.*, 142 B.R. at 642.

■ Despite the statute's potentially broad reach, administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources that will be equally distributed among creditors. *See In re FBI Distrib. Corp.*, 330 F.3d 36, 41–42 (1st Cir.2003); *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865 (4th Cir. 1994); *In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir.1988); *In re Dena Corp.*, 312 B.R. 162, 171 (Bankr.N.D.Ill.2004); *In re Dynacircuits, L.P.*, 143 B.R. 174, 176–77 (Bankr.N.D.Ill.1992). The policy underlying priority treatment for administrative expenses is to encourage creditors to extend credit to debtors in order to enable a reorganization to succeed. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984). To that end, in order to establish the priority of an administrative claim, the claimant must demonstrate that the debt (1) arose out of a transaction with the debtor-in-possession and (2) benefited the operation of the debtor's business. *Id.* at 586–87 (*citing In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)); *In re Pre–Press Graphics Co.*, 287 B.R. 726, 730 (Bankr.N.D.Ill.2003) (*citing Jartran*).

The moving party bears the burden of proving that its claim is entitled to administrative expense priority. *FBI Distrib.*, 330 F.3d at 42; *Ford Motor Credit*, 35 F.3d at 866; *In re DeMert & Dougherty, Inc.*, 227 B.R. 508, 512 (Bankr.N.D.Ill. 1998); *In re Woodstock Assocs. I, Inc.*, 120 B.R. 436, 451 (Bankr.N.D.Ill.1990). The standard of proof is a preponderance of the evidence. *Cargill Fin. Servs. Corp., IDS v. Envirodyne Indus., Inc.*, No. 94 C 6950, 1995 WL 461854, at *3 (N.D.Ill. July 12, 1995); *Solow v. Am. Airlines, Inc. (In re Midway Airlines, Inc.)*, 221 B.R. 411, 446 (Bankr.N.D.Ill.1998); *In re Sinclair*, 92 B.R. 787, 788 (Bankr.S.D.Ill.1988).

"[F]or a claim to be allowed as an administrative expense, goods or services must be delivered or provided pursuant to a post-petition transaction; it is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor prepetition." 4 A. Resnick & H. Sommer, *Collier on Bankruptcy* ¶ 503.06[3][a], at 503–25 (15th ed. rev.2004) (footnote omitted); *see also Dynacircuits*, 143 B.R. at 176 (noting that it is the time at which the services are rendered that is dispositive). In *Mammoth Mart*,[7] the First Circuit discussed the postpetition transaction requirement, opining:

> When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of § 64(a)(1) plainly require that their claims be afforded priority. It is equally clear that a claimant who fully performs under a contract prior to the filing of the

petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing.

536 F.2d at 954 (footnote omitted).

To qualify as actual and necessary expenses, expenditures must also benefit the estate as a whole. *In re Jartran, Inc.*, 886 F.2d 859, 871 (7th Cir.1989). Claims under § 503(b)(1)(A) are to be measured by the benefit received by the estate rather than the costs incurred by a claimant. *See DeMert & Dougherty*, 227 B.R. at 513 ("Claims under § 503(b)(1)(A) are judged by the actual value received by the estate and not the cost incurred by the creditor."). Further, if a creditor incurred expenses acting in its own interest, it is not entitled to an administrative expense. *In re Cheatle*, 150 B.R. 266, 269 (Bankr. D.Colo.1993).

The Creditor's request for an administrative expense claim is based on the Contract and National Steel's alleged breach thereof. The Creditor maintains that it purchased substantial amounts of steel at $1,106,351.54 above the Contract rate and that, in doing so, National Steel's estate benefited. It is worth noting that the situation at bar is not the typical scenario wherein a creditor provides goods or services to the debtor and the creditor seeks payment for those goods or services as an administrative expense claim. Instead, National Steel provided steel to the Creditor who, in turn, paid for that steel, albeit at a price higher than the one provided for in the Contract. Despite this juxtaposition of the parties, the Creditor's claim must

---

7. The *Mammoth Mart* case was decided under § 64(a)(1) of the Bankruptcy Act, which is the predecessor to § 503(b)(1)(A). That provision provided in relevant part as follows:

> The debts to have priority, in advance of the payment of dividends to creditors, and to be

paid in full out of bankrupt estates, and the order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition. . . .

comport with the language and underlying purpose of § 503(b)(1)(A), or it will fail.

Turning to the *Jartran* test, National Steel argues that the first element has not been met because the Contract was executed prior to its bankruptcy filing, and, thus, any claim asserted thereunder by the Creditor must be considered a pre-petition claim. The Court disagrees. It is true that the Contract between the Creditor and National Steel was entered into prior to National Steel's bankruptcy filing on March 6, 2002. However, the focus for purposes of the first *Jartran* element turns on whether the right to payment arises pre-petition or post-petition, not the time at which the contract is executed. *See In re Lease–A–Fleet, Inc.,* 140 B.R. 840, 845 (Bankr.E.D.Pa.1992). In the matter at bar, the Creditor's claim arose from its post-petition purchase of steel from National Steel. Accordingly, the Court finds that the first *Jartran* element has been met.

With respect to the second element of the *Jartran* test, the Court finds that the Creditor has not demonstrated that its purchase of steel from National Steel at the higher price benefited the operation of National Steel's business for § 503(b)(1)(A) purposes. The Court finds that the Creditor did not incur any "actual, necessary costs and expenses of preserving the estate" in connection with the purchase of steel from National Steel at the increased price under the Amended Price Proposal. Instead, the Creditor seeks the

costs and expenses that it incurred as a result of National Steel's alleged breach of the Contract, including the amount it paid for the steel above the Contract price, its financing charges, interest, and attorneys' fees and costs. The Creditor does not allege that National Steel failed to deliver steel in exchange for the money it paid to National Steel or that the steel was defective in some way or not made to the required specifications. Rather, the Creditor contends that under the Amended Price Proposal it overpaid for the steel. Thus, the Creditor cannot be said to have incurred actual, necessary costs and expenses of preserving National Steel's estate.

Further, according to James Nelson ("Nelson"), an employee of National Steel for twenty-six years as manager of financial customer service as well as of accounts payable, the price that National Steel charged the Creditor was below the market rate for steel. Trial Tr. Day 2 at 4–6, 14. To support his testimony, Nelson prepared a pricing recapitulation of the invoices sent to the Creditor for the period November 26, 2001 through November 7, 2002 [8], as well as a comparison of the rates on those invoices to the American Metal Market ("AMM") [9] price for steel. National Steel Ex. No. 14. Nelson testified that this document demonstrated that, at all relevant times, the invoice price charged by National Steel for the steel supplied to the Creditor was below the AMM market

---

8. It is unclear why the invoices in this exhibit cover the period November 26, 2001 through November 7, 2002 when National Steel imposed the price increase per the Amended Price Proposal for the period October 1, 2002 through the expiration of the Contract, December 31, 2002. Thus, the Court questions the relevance of the invoices prior to October 1, 2002.

9. AMM is a metals industry trade publication that publishes a variety of market metal prices. National Steel Ex. No. 14. The published prices are determined by AMM. *Id.* Nelson testified that he spoke to Scott Robertson, editor of *North American Steel,* who computes an average market price for basic hot-rolled steel on a weekly basis by regularly contacting 15 to 18 steel buyers. *Id.;* Trial Tr. Day 2 at 10–11.

price for steel. Trial Tr. Day 2 at 12–14. Although the Creditor did not object to this exhibit, the Court hastens to note that the document raises more questions than it answers. Specifically, the Court does not fully comprehend the method utilized by Nelson to arrive at some of the calculations. For example, in the last column of the exhibit, Nelson lists the price per ton variance from the AMM price. National Steel Ex. No. 14. However, the AMM price for steel and National Steel's price were calculated by a per hundred weight measure, not a ton measure. *Id.* The Court questions why Nelson would not have employed the same unit of measure when comparing those prices. It is unclear from either the exhibit itself or the testimony why this unit change was made. Further, the Court is unable to discern how Nelson arrived at the figures in the final column or the significance, statistical or otherwise, of the information. Finally, the invoices that were utilized to prepare the exhibit do not cover the full time period at issue—October 1, 2002 through December 31, 2002.

Nevertheless, Nelson clearly testified that even at the higher prices the Creditor was being charged below the then market rate for the purchase of steel from National Steel for a portion of the relevant time frame. The unchallenged testimony and the uncontroverted evidence demonstrated that even after National Steel increased its price under the Amended Price Proposal, the Creditor was still paying for the steel at a rate below market. Hence, the Creditor's contention that the overpayment of $1,106,351.54 to National Steel constituted a benefit to its estate fails.

With respect to the other components of the Creditor's claim—the finance charge, interest, attorneys' fees and costs, the Court finds that the Creditor incurred these expenses while acting in its own interest. If a creditor incurs expenses while acting substantially in its own interest, it is not entitled to an administrative expense claim. *Cheatle,* 150 B.R. at 269. The focus for purposes of determining a benefit to the estate turns on actual benefits conferred upon the estate, not losses sustained by the creditor. *Cargill,* 1995 WL 461854, at *3.

In sum, National Steel's estate received no benefit from the Creditor's payment of approximately $1,000,000.00 above the Contract price because the price it paid for the steel was under the market rate at the time. The Creditor failed to satisfy the second element of the *Jartran* test. Accordingly, the Court finds that the Creditor is not entitled to an administrative expense claim under § 503(b)(1)(A).

Notwithstanding the Court's conclusion that the Creditor has failed to satisfy both *Jartran* elements, a mechanical application of the *Jartran* test in this matter must be supplemented by a discussion of the interplay between administrative claims under § 503(b)(1)(A) and executory contracts pursuant to 11 U.S.C. § 365. Specifically, National Steel contends that the Creditor cannot assert a claim for an administrative expense payment under § 503(b) because the Contract was not assumed or rejected by National Steel pursuant to § 365. As a result, the argument continues, the Creditor cannot enforce the Contract against National Steel, and its claim resulting from National Steel's alleged breach of the Contract does not constitute an administrative expense. The Court agrees.

### B. *11 U.S.C. § 365*

#### 1. Whether the Contract Was Executory

Initially, the Court must determine whether the Contract was in fact an executory contract. The Bankruptcy Code does not define the term "executory con-

tract," and the legislative history offers little guidance.[10] The Seventh Circuit Court of Appeals has defined an executory contract as one in " 'which performance remains due to some extent on both sides.' " *In re Superior Toy & Mfg. Co.,* 78 F.3d 1169, 1172 n. 3 (7th Cir.1996) (*quoting* 2 L. King, *Collier on Bankruptcy* ¶ 365.02, at 365–21 (15th ed.1995)); *In re Crippin,* 877 F.2d 594, 596 (7th Cir.1989) (*quoting* V. Countryman, *Executory Contracts in Bankruptcy: Part 1,* 57 Minn. L.Rev. 439, 460 (1973)).[11] Based upon the definition of executory contract, the Court finds, and neither party disputes, that the Contract at bar was an executory contract.

### 2. The Effect of National Steel's Failure to Assume or Reject the Contract

■ Next, the Court must determine the effect of National Steel's failure to assume or reject the Contract pursuant to § 365. It is undisputed that National Steel never assumed or rejected the Contract.[12] Citing *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), National Steel argues that because it never assumed or rejected the Contract, the Contract cannot be enforced against it. In addition, National Steel contends that an executory contract must be assumed before a creditor can have a claim categorized as an administrative expense under § 503(b). National Steel cites to *In re Airlift International, Inc.,* 761 F.2d 1503 (11th Cir.1985) for the proposition that a breach of an executory contract not assumed prior to confirmation is deemed to have occurred pre-petition and is not entitled to administrative expense status.[13]

■ Under the Bankruptcy Code, a trustee (or, in the case at bar, the debtor-

10. The legislative history of § 365(a) states that the term "executory contract" "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 95–595, at 347 (1977), S.Rep. No. 95–989, at 58 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6303. *See also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 n. 6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (quoting the legislative history).

11. Professor Vern Countryman of Harvard Law School coined the definition of executory contract for bankruptcy purposes as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* (footnote omitted).

12. The Bankruptcy Code expressly requires court approval of a motion to assume or reject an executory contract. *See* 11 U.S.C. § 365(a). The parties do not dispute that this Court never entered an order approving the assumption or rejection of the Contract at bar.

The Seventh Circuit Court of Appeals has held that an executory contract may not be assumed by implication by simply accepting benefits under the contract. *In re Whitcomb & Keller Mortgage Co.,* 715 F.2d 375, 380 (7th Cir.1983). *See also S.N.A. Nut Co. v. Haagen-Dazs Co. (In re S.N.A. Nut Co.),* 191 B.R. 117, 121 (Bankr.N.D.Ill.1996); *In re Providence Television Ltd. P'ship,* 113 B.R. 446, 451–52 (Bankr.N.D.Ill.1990); *In re Kinglore Farms, Inc.,* 64 B.R. 260, 261 (Bankr.N.D.Ill.1986). Accordingly, any argument that National Steel assumed the Contract by accepting benefits thereunder would fail.

13. National Steel's reliance on this case is clearly misplaced. The *Airlift International* court posited that there are three general circumstances involving executory contracts where the effect of a breach by the debtor must be considered: (1) when the debtor elects not to assume an executory contract *and rejects it;* (2) when the debtor assumes an executory contract prior to confirmation of the plan; and (3) when the debtor during the bankruptcy case enters into a new executory contract. *Airlift Int'l,* 761 F.2d at 1508–09 (emphasis supplied). The court noted that in the first instance, where the contract is not assumed prior to confirmation and the debtor rejects it, the breach is deemed to have occurred pre-petition, giving rise to a pre-peti-

in-possession pursuant to 11 U.S.C. § 1107(a))[14] "subject to the court's approval, may assume or reject any executory contract ... of the debtor." 11 U.S.C. § 365(a). This power is essential to the general purposes of a Chapter 11 reorganization "because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Bildisco,* 465 U.S. at 528, 104 S.Ct. 1188; *see also Precision Indus., Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 546 (7th Cir.2003) *(citing Bildisco).* Pursuant to § 365(d)(2), the debtor-in-possession generally need not elect assumption or rejection of an executory contract until confirmation of a plan. *See* 11 U.S.C. § 365(d)(2).[15] However, "[r]ejection or assumption of an executory contract determines the status of the contracting creditor's claim, namely whether 'it is merely a pre-petition obligation of the debtor or is entitled to priority as an expense of administration of the estate.' " *In re Univ. Med. Ctr.,* 973 F.2d 1065, 1078 (3d Cir.1992) *(quoting Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n,* 826 F.2d 434, 437 (6th Cir.1987)).

 If a debtor-in-possession assumes an executory contract, "it assumes the contract *cum onere,*" and the liabilities incurred in performing the contract will be treated as administrative expenses under § 503(b)(1)(A). *Bildisco,* 465 U.S. at 531–32, 104 S.Ct. 1188. If the contract is rejected, the contract is deemed breached on the date "immediately before the date of the filing of the petition," 11 U.S.C. § 365(g)(1), and the non-debtor party has a pre-petition, general unsecured claim for breach of contract damages that is not entitled to administrative priority, 11 U.S.C. § 502(g). *See Bildisco,* 465 U.S. at 531, 104 S.Ct. 1188. A claim for breach of a pre-petition contract that has not been assumed is a pre-petition claim, not a claim under § 503(b), even if the breach occurs post-petition. *See In re Dornier Aviation (N. Am.), Inc.,* No. 02–82003–SSM, 2002 WL 31999222, at *7 (Bankr.E.D.Va. Dec.18, 2002). If the executory contract expires by its own terms during the post-petition, pre-assumption/rejection period, as was the situation at bar, the debtor-in-possession has nothing to assume or reject. *See* R. Ginsberg & R. Martin, *Ginsberg & Martin on Bankruptcy* § 7.01[C], at 7–8 n. 37 (4th ed. 1995 & Supp.2004).

The thorny problem here is exacerbated in part by the confusing labyrinth of the text of § 365. Indeed, one noted authority refers to § 365 as "perhaps the most discussed and cussed provision of the Bank-

tion claim under 11 U.S.C. § 502(g), not an administrative expense claim under § 503(b). *Id.* at 1509. The fatal flaw in National Steel's reliance on this case lies in the fact that none of these situations existed in the matter at hand. National Steel never rejected the Contract at issue. Rather, the Contract expired by its own terms. Thus, § 502(g) does not apply because National Steel did not reject the Contract. Further, National Steel never assumed the Contract prior to confirmation, nor did it enter into a new executory contract. Therefore, *Airlift International* fails to lend support to National Steel's position.

**14.** Section 1107(a) provides in part that "a debtor in possession shall have all the rights

... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a).

**15.** Section 365(d)(2) provides in relevant part:

In a case under chapter ... 11 ... of this title, the trustee may assume or reject an executory contract ... of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract ..., may order the trustee to determine within a specified period of time whether to assume or reject such contract....

11 U.S.C. § 365(d)(2).

ruptcy Code." 1 D. Epstein, S. Nickles & J. White, *Bankruptcy* § 5–26, at 492 (1992). Another leading authority speaks to the type of dispute and polarity of the positions of the parties at bar, noting that "[t]he Code is silent on the rights and obligations of the parties to an executory contract ... during the limbo period—that is, the period between the filing of the petition and the time of assumption or rejection." G. Treister, J.R. Trost, L. Forman, K. Klee & R. Levin, *Fundamentals of Bankruptcy Law* § 5.04(e), at 247 (5th ed.2004).

▮▮▮▮ An executory contract generally remains in effect pending assumption or rejection by the debtor-in-possession. *See In re Pub. Serv. Co. of N.H.*, 884 F.2d 11, 14 (1st Cir.1989). *Cf. In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 484 (2d Cir. 1994) (finding that unexpired leases that are neither assumed or rejected continue in effect). Along those lines, most courts agree that before an executory contract is assumed or rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession, but not enforceable against the debtor-in-possession. *See Bildisco*, 465 U.S. at 532, 104 S.Ct. 1188;[16] *FBI Distrib.*, 330 F.3d at 43; *United States ex rel. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir.1994); *Univ. Med. Ctr.*, 973 F.2d at 1075; *Whitcomb & Keller Mortgage*, 715 F.2d at 378; *St. Francis Physician Network, Inc. v. Rush Prudential HMO, Inc. (In re St. Francis Physician Network, Inc.)*, 213 B.R. 710, 714, 716–17 (Bankr. N.D.Ill.1997); *S.N.A. Nut Co.*, 191 B.R. at 120; *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899, 907 (Bankr.D.Mass.1994); *Providence Televi-*

*sion Ltd. P'ship*, 113 B.R. at 451; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 700 (Bankr.W.D.Tex.1988); *Skeen v. Denver Coca–Cola Bottling Co. (In re Feyline Presents, Inc.)*, 81 B.R. 623, 626 (Bankr. D.Colo.1988); *Wilson v. TXO Prod. Corp. (In re Wilson)*, 69 B.R. 960, 965–66 (Bankr.N.D.Tex.1987). The non-debtor party must continue to perform under the contact prior to assumption or rejection, but the debtor-in-possession is not bound by the provisions of the executory contract unless the contract is subsequently assumed. *Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 72 (Bankr. W.D.Tex.1996). Authority also exists for the proposition that the trustee can enter into a new contract that supersedes the old one. *See In re F.H. Lawson Co.*, 97 B.R. 895, 897 (Bankr.S.D.Ohio 1989).

▮▮▮ As a corollary to its holding that an executory contract is unenforceable against the estate prior to assumption, the United States Supreme Court opined in *Bildisco* that even if a debtor-in-possession postpones the assumption/rejection decision but continues to receive benefits under the executory contract, "the debtor-in-possession is obligated to pay for the reasonable value of those services, ... which, depending on the circumstances of a particular contract, may be what is specified in the contract...." *Bildisco*, 465 U.S. at 531, 104 S.Ct. 1188. *Accord FBI Distrib.*, 330 F.3d at 42–44 (finding that where the debtor-in-possession induces the non-debtor to render performance under an unassumed prepetition executory contract, pending its decision to assume or reject, the non-debtor party will be entitled to administrative expense priority only to the

---

**16.** The *Bildisco* case addressed collective bargaining agreements but has been interpreted to include all types of executory contracts. *See* D. Bordewieck, *The Postpetition, Pre–Rejection, Pre–Assumption Status of an Executo-*

*ry Contract,* 59 Am. Bankr.L.J. 197, 199 (1985) (stating that in *Bildisco* "[t]he Court spoke in general terms; it did not limit its discussion to the particular executory contract....").

extent that the consideration supporting the claim was supplied to the debtor-in-possession post-petition and was beneficial to the estate); *In re Chateaugay Corp.*, 10 F.3d 944, 955 (2d Cir.1993) (same); *In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 716 (Bankr.M.D.Fla.2000) (same); *In re Res. Tech. Corp.*, 254 B.R. 215, 221 (Bankr. N.D.Ill.2000) (same).

 The Court finds that the analysis in the *Bildisco* decision applies to all executory contracts, not just to collective bargaining agreements. Accordingly, the Court holds that *Bildisco* controls the outcome in this matter. The Contract at bar was a pre-petition executory contract that National Steel did not assume or reject under § 365(a). Rather, National Steel continued to operate under the Contract, albeit modifying the price term for the purchase of the steel under the Amended Price Proposal, prior to the expiration of the Contract by its own terms. Pursuant to *Bildisco*, the Creditor could not enforce the terms of the Contract against National Steel. 465 U.S. at 532, 104 S.Ct. 1188. In other words, National Steel was not bound by the provisions of the executory Contract and, therefore, was not prohibited from proposing the Amended Price Proposal. In fact, National Steel was "empowered by virtue of the Bankruptcy Code" to deal with the Contract "in a manner it could not have done absent the bankruptcy filing." *Id.* at 528, 104 S.Ct. 1188. Thus, the Creditor's argument that National Steel breached the Contract when it unilaterally modified the price term fails. The Creditor's citation to Michigan law regarding the prohibition against modifying existing contracts unless both parties agree is, therefore, misplaced.

While the United States Supreme Court has held that a party to a pre-petition executory contract that has not been assumed may still be entitled to administrative expense priority to the extent that the estate has actually benefited under the contract post-petition, *Bildisco*, 465 U.S. at 531, 104 S.Ct. 1188, that proposition is inapposite to the matter at bar. As discussed *supra*, National Steel's estate did not actually benefit under the Contract post-petition pursuant to the *Jartran* test. Further, the total amount that the Creditor seeks as an administrative expense constitutes its damages as a result of the alleged breach, including the overpayment for the steel, finance charges, interest, attorneys' fees and costs. The measure of a claim under § 503(b)(1)(A) is the benefit received by the estate, not the costs or damages incurred by a claimant, *DeMert & Dougherty*, 227 B.R. at 513, nor a claimant's expenses incurred while acting in its own interest, *Cheatle*, 150 B.R. at 269. Accordingly, the Court finds that the Creditor's claim is not entitled to administrative expense priority.

Moreover, it is most significant that the Creditor failed to take timely action to seek appropriate relief during the term of the executory Contract. Specifically, the Creditor failed to come before the Court to seek relief from the automatic stay under 11 U.S.C. § 362(d). Nor did the Creditor seek to compel National Steel to assume or reject the Contract pursuant to § 365(d)(2).[17] Instead of availing itself of the procedures set forth in the Bankruptcy Code to compel National Steel's decision to assume or reject the Contract, the Creditor paid National Steel the higher price pursuant to the Amended Price Proposal

---

17. The intent behind this section of the Code is to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." H.R.Rep. No. 95–595, at 348 (1977), S.Rep. No. 95–989, at 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845.

and chose to "reserve its rights." That reservation of rights, however, does not ipso facto entitle the Creditor to the elevated administrative priority expense status for the amount it paid over and above the price set forth in the Contract. On these facts, the Court will not, in the name of "equity," afford the Creditor an administrative expense claim in light of the clear mandate from the United States Supreme Court and in the absence of express Congressional direction under the Bankruptcy Code.

## C. Contract Principles Under Michigan Law [18]

### 1. The Voluntary Payment Doctrine

National Steel argues that the Creditor's claim is, in essence, an allegation of breach by National Steel of a pre-petition contract. In response to this allegation, National Steel contends that under contract principles, the Creditor "voluntarily" paid the higher price for the steel and, thus, should be prevented from now seeking an administrative expense claim.

▮▮▮▮ Pursuant to the voluntary payment doctrine, " '[w]here money has been voluntarily paid with full knowledge of the facts, it cannot be recovered on the ground that the payment was made under a misapprehension of the legal rights and obligations of the person paying.' " *Montgomery Ward & Co. v. Williams,* 330 Mich. 275, 285, 47 N.W.2d 607, 612 (1951) (*quoting* 53 A.L.R. 949); *see also Progressive Mich. Ins. Co. v. United Wis. Life Ins. Co.,* 84 F.Supp.2d 848, 854 (E.D.Mich. 2000) (*quoting Montgomery Ward* ). "[A]

voluntary payment is one made with a full knowledge of all the circumstances upon which it is demanded, and without artifice, fraud, or deception on the part of the payer, or duress of the person, ·or goods of the person making the payment." *Pingree v. Mut. Gas Co.,* 107 Mich. 156, 157, 65 N.W. 6, 7 (1895). In contrast, an involuntary payment is one made " 'by reason of a mistake or ignorance of a material fact.' " *Wilson v. Newman,* 463 Mich. 435, 442, 617 N.W.2d 318, 321 (2000) (*quoting Pingree,* 107 Mich. at 159–60, 65 N.W. at 8). Where a payment is made under a mistake of fact, the voluntary payment doctrine does not apply, and the payment may be recovered, even if the mistake is the result of a lack of investigation. *Durant v. ServiceMaster Co.,* 159 F.Supp.2d 977, 981 (E.D.Mich.2001); *Wilson,* 463 Mich. at 440, 617 N.W.2d at 320–21; *Montgomery Ward,* 330 Mich. at 284, 47 N.W.2d at 611–12.

▮▮▮ In the matter at bar, the Creditor does not allege that it submitted full payment to National Steel based on a mistake of fact. Indeed, the parties do not disagree that the Creditor was fully aware that it would be charged more than the price indicated in the original Price Proposal for the steel received from October 2002 through December 31, 2002 pursuant to the terms of the Amended Price Proposal. Nor is it disputed that the Creditor made the payment voluntarily, notwithstanding the fact that it announced the reservation of its rights to later "evaluate the situation." Despite the Creditor's fervent denials that it agreed to the price increase and that such an increase was

---

**18.** Because the parties have raised and given substantial consideration to the issues of the voluntary payment doctrine and economic duress, the Court addresses those issues below. However, as discussed *supra,* because National Steel did not assume or reject the Contract pursuant to § 365(a), the Contract was not

enforceable against National Steel. Therefore, ordinarily contract principles are not controlling in this matter. *See Whitcomb & Keller Mortgage,* 715 F.2d at 379 ("[G]eneral principles governing contractual benefits and burdens do not always apply in the bankruptcy context.").

inappropriate under the Contract, the Creditor made an affirmative, voluntary decision to pay the price increase in order to guarantee an uninterrupted supply of steel for its OEMs and to prevent financial devastation to the Creditor's business. The Court finds that the requirements of the voluntary payment doctrine have been met and that, accordingly, the Creditor cannot recover any portion of the payment at issue made to National Steel.

## 2. Economic Duress

In response to National Steel's allegation that the Creditor is precluded from seeking an administrative expense claim because it voluntarily paid the higher price for the steel, the Creditor argues that it tendered the payments under economic duress. Specifically, the Creditor maintains that because National Steel was its sole supplier of the type of specialized steel necessary to produce wheels for its OEMs, and no other Tier 2 supplier had gone through the PPAP and had been approved by the OEMs to provide such steel, the Creditor had no choice but to pay the increased price for the steel or suffer severe economic repercussions.

 The question as to what constitutes economic duress is a matter of law, while whether duress exists in a particular case is a question of fact. *Norton v. Mich. State Highway Dep't*, 315 Mich. 313, 319, 24 N.W.2d 132, 135 (1946) (*citing Clement v. Buckley Mercantile Co.*, 172 Mich. 243, 253, 137 N.W. 657, 661 (1912)); *Lafayette Dramatic Prods., Inc. v. Ferentz*, 305 Mich. 193, 216, 9 N.W.2d 57, 65 (1943) (*citing Clement*). In order to overcome the application of the voluntary payment doctrine and establish economic duress, the Creditor must demonstrate that under

Michigan law[19] it was subjected to the threat of an unlawful act. Specifically, the Michigan Supreme Court has stated that " '[d]uress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.' " *Beachlawn Bldg. Corp. v. City of St. Clair Shores*, 370 Mich. 128, 133, 121 N.W.2d 427, 429–30 (1963) (*quoting Hackley v. Headley*, 45 Mich. 569, 574, 8 N.W. 511, 512–13 (1881)); *Norton*, 315 Mich. at 320, 24 N.W.2d at 135 (*quoting Hackley*); *Lafayette*, 305 Mich. at 216, 9 N.W.2d at 65 (same). Accordingly, the Creditor must establish that it was illegally compelled or forced to act "by fear of serious injury" to its reputation or fortunes. *Farm Credit Servs. of Michigan's Heartland v. Weldon*, 232 Mich.App. 662, 681–82, 591 N.W.2d 438, 447 (1998) (internal quotation omitted); *Quartell v. Great Lakes Bancorp*, No. 183368, 1996 WL 33347624, at *2 (Mich.App. Dec.17, 1996) (*citing Norton*, 315 Mich. at 319, 24 N.W.2d at 135). Fear of economic hardship or financial devastation, alone, however, is insufficient to establish economic duress. *Cochran v. Ernst & Young*, 758 F.Supp. 1548, 1556 (E.D.Mich.1991). The Creditor must also demonstrate that National Steel acted unlawfully. *See id. See also Gen. Motors Corp. v. Paramount Metal Prods. Co.*, 90 F.Supp.2d 861, 875 (E.D.Mich.2000) ("Economic duress may be accomplished through a 'wrongful' act as well as an 'illegal' act."); *Beachlawn Bldg. Corp.*, 370 Mich. at 132, 121 N.W.2d at 429–30; *Norton*, 315 Mich. at 320, 24 N.W.2d at 135; *Lafayette*, 305 Mich. at 216, 9 N.W.2d at 65; *Apfelblat v. Nat'l Bank Wyandotte–Taylor*, 158 Mich.App. 258, 263–64, 404 N.W.2d 725, 728 (1987)

---

**19.** The Court has already determined that pursuant to the Contract, Michigan law applies to this dispute where applicable, subject to any controlling provisions of the Bankruptcy Code.

(*per curiam*) ("Duress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune."); *Barnett v. Int'l Tennis Corp.*, 80 Mich.App. 396, 405, 263 N.W.2d 908, 913 (1978).

The Creditor acknowledges that the Michigan Supreme Court's decision in *Lafayette* and subsequent lower court cases in Michigan have held that a defendant's conduct must be "unlawful" or "illegal" to establish a claim of economic duress. Nevertheless, the Creditor urges the Court to adopt a contemporary formulation of duress, one which can be satisfied if an act or threat is either illegal or merely wrongful. In support of its position, the Creditor cites *Kelsey–Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F.Supp. 794 (E.D.Mich.1990). In *Kelsey–Hayes*, the court held that "economic duress can exist in the absence of an illegal threat; the threat must merely be wrongful. Even acts lawful and non-tortious may be wrongful depending on the circumstances." *Id.* at 797 (*citing, inter alia*, S. Williston & W. Jaeger, *Williston on Contracts* § 1606 (3d ed.1972)). In a lengthy footnote, the court examined the history of economic duress in Michigan, explaining that

> while the dimensions of the duress doctrine have expanded in other jurisdictions, Michigan courts continue to apply the restrictive principles of the early common-law. The decisions routinely cite *Hackley*, in which the Michigan Supreme Court states that a threat must be unlawful, not merely wrongful, in order for there to be duress.

*Id.* at 797 n. 5. Despite the Michigan courts' adherence to the requirement of an unlawful act, the *Kelsey–Hayes* court posited that if the Michigan Supreme Court were to re-examine the issue today, it would conclude that economic duress need not originate in an "illegal" act or threat—

that a wrongful act, even if lawful, is sufficient to support a claim of duress. *Id.*

The Court declines to accept the Creditor's invitation to adopt a more modern formulation regarding economic duress, which, to date, the Michigan Supreme Court has yet to embrace. Further, the Court finds that the Creditor has not demonstrated under Michigan law that it was under economic duress when it purchased steel from National Steel at the higher price pursuant to the Amended Price Proposal. The Creditor has failed to show that National Steel engaged in any illegal or unlawful conduct. Even if National Steel had assumed the Contract, proposing a modification to the agreement is not unlawful, and refusing to abide by the Contract falls short of proscribed duress. *See Quartell*, 1996 WL 33347624, at *2. Moreover, because National Steel did not assume the Contract after it filed bankruptcy, the Creditor could not force National Steel to honor the terms of the Contract. Hence, it was not illegal, unlawful or even wrongful for National Steel to submit the Amended Price Proposal to the Creditor and propose that the parties conduct business on terms and conditions different from those set forth in the Contract.

Even if the Creditor feared that it would suffer a financial catastrophe if it did not comply with the terms of the Amended Price Proposal, fear of financial ruin alone does not establish the existence of economic duress. *See Cochran*, 758 F.Supp. at 1556. Further, the uncontroverted facts demonstrated that National Steel never threatened to cease shipping steel to the Creditor; thus, any fear of financial ruin on the part of the Creditor was unfounded. The Court acknowledges that the Creditor was in a difficult predicament when faced with National Steel's Amended Price Proposal for the remaining three-month term of the Contract. However, the Court will

not leap to the finding that the Creditor was unlawfully or illegally forced to act by fear of serious injury to its financial condition.

Finally, to support its position that National Steel engaged in illegal or unlawful conduct, the Creditor cites to an e-mail message between two representatives at National Steel wherein they acknowledge that "price increases to a company in bankruptcy is against the law." Creditor Ex. No. 5. The mere fact, however, that a party makes such a statement does not ipso facto make its actions illegal or unlawful.

▪ The Court hastens to add that the Creditor is a large, sophisticated entity with competent management and knowledgeable businesspeople who considered the terms of the Amended Price Proposal. Additionally, the Creditor had access to and indeed consulted with legal counsel to evaluate its alternatives before it made the decision to pay the price increase. The Creditor had full knowledge of all the facts and made the choice to pay the increased steel price rather than pursue other alternatives or avenues. "[D]uress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Clement*, 172 Mich. at 255, 137 N.W. at 661; *see also Payne v. Cavanaugh*, 292 Mich. 305, 308, 290 N.W. 807, 808 (1940) (*citing Clement*). Accordingly, the Court finds that the Creditor's decision to pay the increased price was made voluntarily and without proscribed duress under Michigan law.

Nevertheless, the Creditor maintains that it had no Tier 2 supplier other than National Steel for the specific type of steel that National Steel was providing to it and that, thus, the Creditor had no choice but to pay the increased price for the steel.

Therefore, the Creditor insists, it was under economic duress when it paid the higher price. The Court finds that this argument lacks merit. Several steel manufacturers provided the Creditor with price quotations as early as April 2002. National Steel Ex. Nos. 33, 34, 36, 24. In addition, the Creditor acknowledged as early as April 30, 2002 that National Steel might not be supplying steel to its Sedalia plant in 2003. National Steel Ex. No. 28. Furthermore, on June 11, 2002, in an internal communication, the Creditor noted that ISG would not be required to go through the "formal PPAP" because the Creditor had ordered steel from ISG in the past twelve months. National Steel Ex. No. 23. ISG was willing to provide the Creditor with hot-rolled band steel as early as August 1, 2002. Finally, in a June 20, 2002 internal communication, the Creditor suggested that it "[p]lace 100% of our requirements with ISG." National Steel Ex. No. 27. Accordingly, the Court finds meritless the Creditor's argument that it had no alternative sources of steel.

The Court concludes that the Creditor voluntarily paid for steel pursuant to the terms of the Amended Price Proposal with full knowledge of the facts and circumstances and, thus, failed to demonstrate that it tendered the payments under economic duress. Accordingly, the Creditor is precluded from recovering the difference between the amount it paid for steel under the terms of the Amended Price Proposal and the price for steel set forth in the original Price Proposal, the finance charges it incurred as a result of paying the higher price for the steel, and interest and attorneys' fees under the Contract.

### 3. Whether National Steel Violated the Automatic Stay

Finally, the Creditor contends that National Steel violated the automatic stay in

the Creditor's bankruptcy case. Specifically, the Creditor cites to several cases for the proposition that rights under executory contracts, like the Contract at bar, constitute property of the bankruptcy estate.[20] Thus, the Creditor argues, the price increase unilaterally imposed by National Steel in derogation of the Contract constituted a violation of the automatic stay.[21]

■■■■ The filing of a bankruptcy petition creates an estate consisting of the debtor's property. 11 U.S.C. § 541(a). The Bankruptcy Code contains an "expansive definition" of property of the estate, *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir.1987), encompassing "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Under this definition, "virtually all property of the debtor" becomes property of the estate. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir.1993). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Id.* Not surprisingly then, many courts have held that "property" for purposes of § 541 includes executory contracts. *See, e.g., Computer Communications*, 824 F.2d at 730; *In re Palace Quality Servs. Indus., Inc.*, 283 B.R. 868, 880 (Bankr.E.D.Mich.2002); *In re El Paso Refinery, L.P.*, 220 B.R. 37, 41–42 (Bankr.W.D.Tex.1998) (collecting cases); *Drexel Burnham Lambert Group*, 138 B.R. at 702. *But see In re Tonry*, 724

F.2d 467, 469 (5th Cir.1984) ("Until the trustee assumes an executory contract, it does not become part of the bankruptcy estate.").

■■■■ The Creditor states that because National Steel imposed a higher price for the steel without seeking relief from the bankruptcy court in Delaware, National Steel interfered with the Contract, which was property of the Creditor's estate, and, thus, violated the automatic stay. Indeed, the Court finds that the executory Contract at issue was property of both the Creditor's and National Steel's bankruptcy estates. As discussed *supra*, however, the Contract was not enforceable against National Steel because it had not been assumed. Hence, the submission of the Amended Price Proposal to the Creditor did not constitute an act to obtain possession of property of the Creditor's bankruptcy estate or to exercise control over property of its estate in violation of § 362(a)(3). If the Court were to find that National Steel's action did in fact violate the automatic stay, that finding would amount to enforcement of the Contract against National Steel, which is contrary to the language in *Bildisco*. Thus, the Court rejects the Creditor's argument that National Steel violated the automatic stay in the Creditor's bankruptcy case.

Although the Creditor was the debtor-in-possession in its own Chapter 11 case, it found itself in a contractual relationship with an entity that had also filed a Chapter 11 petition. The fact that both parties had filed Chapter 11 petitions and were

---

**20.** *In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir.1987); *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194 (Bankr.S.D.N.Y. 1992); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687 (Bankr.S.D.N.Y. 1992); *LTV Corp. v. Aetna Cas. & Sur. Co. (In*

*re Chateaugay Corp.)*, 116 B.R. 887 (Bankr. S.D.N.Y.1990).

**21.** The Creditor cites to § 362(a)(3) of the Bankruptcy Code which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3).

both debtors-in-possession made the post-petition contractual relationship at bar uncertain. Nevertheless, the Court finds it unusual that the Creditor never sought redress in either bankruptcy case until it filed the claim at bar. The Creditor had several avenues it could have timely pursued in either case, including filing a motion before this Court to compel National Steel to assume or reject the Contract under § 365(d); filing a motion before the Delaware bankruptcy court to assume the Contract in its bankruptcy case; filing an action before the Delaware court to enjoin National Steel from increasing the Contract price; or filing a motion before the Delaware court seeking damages under 11 U.S.C. § 362(h) for National Steel's alleged willful violation of the automatic stay. Instead of filing an appropriate and timely motion, the Creditor made a business decision to pay the increased prices for steel under the Amended Price Proposal and took no action in either venue until November 2003 when it filed its claim.

Finally, the Creditor maintains that the price increase amounted to an attempt by National Steel to collect a pre-petition debt in violation of the automatic stay. The Creditor argues that National Steel's inability to achieve "critical vendor" status in the Creditor's bankruptcy case prompted it to deliver the Amended Price Proposal in an attempt to recoup some of the approximate $5.2 million pre-petition debt the Creditor owed National Steel. The Court finds that the Creditor failed to offer any evidence to support this contention. Instead, the evidence demonstrated that National Steel imposed the price increase pursuant to the Amended Price Proposal because the rates in the original Price Proposal were well below the market rate for steel at the time. National Steel Ex. Nos. 13, 14; Salliote Dep. at 51. Consequently, the Court rejects this point and concludes that National Steel did not act in violation of the automatic stay.

## IV. *CONCLUSION*

For the foregoing reasons, the Court denies the Creditor's motion for payment of its claim as an administrative expense under § 503(b)(1)(A).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.