In re DYNAMIC TOOLING SYSTEMS, INC., Debtor.

No. 04–15900.

United States Bankruptcy Court, D. Kansas.

Aug. 31, 2006.

David G. Arst, Wichita, KS, for Debtor.

**_ORDER OVERRULING HANTOVER, INC.'S OBJECTION TO CONFIRMATION OF BETTCHER INDUSTRIES, INC.'S PLAN OF REORGANIZATION DATED JULY 10, 2006 AND CONFIRMING BETTCHER'S PLAN_**

ROBERT E. NUGENT, Chief Judge.

Creditor Bettcher Industries, Inc.'s ("Bettcher") plan of reorganization dated

July 10, 2006[1] came on for confirmation hearing on August 22, 2006. Robert C. Folland of Thompson Hine LLP, Cleveland, Ohio and W. Thomas Gilman of Redmond & Nazar, LLP, Wichita, Kansas, appeared for Bettcher. Cynthia F. Grimes of Grimes & Rebein, L.C., Lenexa, Kansas and Loren W. Moll of Caldwell & Moll, L.C., Overland Park, Kansas appeared for Hantover, Inc. All other appearances are as recited on the record.

### Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The Court has jurisdiction over this contested matter under 28 U.S.C. § 157(b)(1) and § 1334(b).

### Introduction

After acquiring a secured claim and several unsecured claims in this case, Bettcher filed a creditor's plan to compete with the debtor's proposed plan. On July 21, 2006 the Court entered an order approving Bettcher's and debtor Dynamic Tooling Systems Inc.'s ("DTS" or "debtor") disclosure statements, setting procedures for solicitation and voting on the competing plans, and setting the confirmation hearing for August 22, 2006.[2] On the eve of the confirmation hearing, Bettcher and DTS announced a settlement under which DTS would withdraw its plan and its opposition to Bettcher's plan.[3] The last remaining objection to Bettcher's plan was that of Hantover, Inc. ("Hantover").[4]

Hantover claims that by virtue of its Exclusive Distributorship Agreement (the "Agreement") with DTS, it has a perpetual, irrevocable license to use debtor's intellectual property in the manufacture of knives used in the meat packing industry. Hantover was the debtor's principal customer and is a competitor of Bettcher. At the confirmation hearing, counsel announced that all but two legal issues raised by Hantover's objection to confirmation of Bettcher's plan had been resolved. After hearing argument on those remaining issues from Bettcher's and Hantover's counsel, the Court announced its summary ruling from the bench, reserving the ability to issue a reasoned written opinion on the legal issues remaining. The Court intends that this opinion be incorporated by reference into the Order on Confirmation which the Court directed Bettcher's counsel to prepare for submission in this case.

### Factual Background

DTS filed this chapter 11 case on October 25, 2004 and remained in possession of the assets throughout the case. DTS manufactures knives and knife blades for sale to the meat packing industry. In particular, DTS makes a replacement circular blade for a hand-held power knife used for deboning animal carcasses. Hantover is DTS's principal distributor of these blades. Bettcher makes a hand-held power knife and blades and holds several patents on their designs. DTS's replacement blades fit into Bettcher's knives, making DTS and Bettcher competitors. DTS's principal, Dennis Ross, also holds several patents relating to these circular knives.

In 2003, DTS entered into the Agreement with Hantover.[5] Under this Agreement, Hantover would sell knives and blades manufactured by DTS and, when the Agreement terminated, Hantover

---

1. Dkt. 195.

2. Dkt. 207.

3. Dkt. 187 (Second Amended Chapter 11 Plan dated July 11, 2006 filed by debtor); Dkt. 240 (Objection to Confirmation of Bettcher Plan fled by debtor) and Dkt. 250 (Debtor's Motion to Designate Bettcher's Votes and Claims pursuant to 11 U.S.C. § 1126(e)).

4. Dkt. 237.

5. Dkt. 188, Attachment # 1, Ex. A.

would also receive a perpetual and irrevocable license to manufacture DTS products utilizing DTS's intellectual property. This Agreement remained in effect on the date of confirmation.

This chapter 11 case has been highly contested, particularly since Bettcher became involved by acquiring several claims of DTS's creditors. Since most of the controversies have been resolved by the Bettcher–DTS settlement, the Court need not exhaustively detail the tortured procedural history beyond what follows. DTS proposed a plan of reorganization by which it would pay its secured creditor over time, and repay the unsecured creditors over 60 months.[6] DTS intended to assume the Hantover Agreement as a means of implementing the plan. At no time during these proceedings did Hantover seek to shorten the time in which the debtor could assume or reject its Agreement under 11 U.S.C. § 365(d)(2).[7]

After debtor's first amended plan was filed on March 7, 2006,[8] Bettcher began to acquire the unsecured claims of DTS's creditors. By late March of 2006, it had acquired several claims and entered its appearance in the case as a creditor and party in interest.[9] Eventually, Bettcher bought out the claim of First Bank of Kansas, debtor's secured lender, and filed its own plan and disclosure statement.[10] DTS and Bettcher objected to each other's disclosure statements. Hantover objected

to Bettcher's disclosure statement[11] and, on July 11, 2006, the Court conducted a disclosure statement adequacy hearing pursuant to § 1125.

At the hearing, the Court made several rulings about the content of the competing statements and ordered the parties to amend their respective disclosures accordingly. The Hantover objections that are relevant to this opinion were that Bettcher had failed to state how it intended to treat Hantover's Agreement and that Bettcher's possible rejection of the Agreement would result in termination damages that, if allowed as a claim, would render insufficient the $700,000 distribution that Bettcher offered as payment of the claims. Because Bettcher had signaled an intention to submit a term sheet on assuming the Agreement in its plan, Hantover announced at the hearing that it would withdraw its objection to disclosure. Both DTS and Bettcher then filed amended plans and disclosure statements that were noticed for balloting and a confirmation hearing on August 22, 2006.[12]

Bettcher's plan provided for an aggregate distribution capped at $700,000 for all Allowed Claims, backed by a $750,000 letter of credit issued by Fifth Third Bank, and a transfer of all DTS assets to Bettcher's subsidiary, R & F Intellectual Property Acquisition, Inc. ("R & F"). R & F would acquire, free and clear of any liens or interests, DTS's assets, including any

---

6. *See* Dkt. 74, Debtor's Chapter 11 Plan of Reorganization dated October 14, 2005.

7. All subsequent statutory references are to the Bankruptcy Code in effect prior to October 17, 2005, 11 U.S.C. § 101, et seq., unless otherwise noted.

8. *See* Dkt. 106 where the debtor states the amendment to its plan of reorganization was precipitated by the failed negotiations between debtor and Bettcher for the sale of debtor's assets to Bettcher.

9. Dkt. 116, 117 and 118

10. Dkt. 128 and 129, 131.

11. Dkt. 176.

12. Dkt. 187 and 188 (DTS's Second Amended Plan and Disclosure Statement); Dkt. 195 and 196 (Bettcher's Plan and Disclosure Statement).

intellectual property it owned. R & F would be designated as an estate representative under § 1123(b)(2) to retain any claims or interests of the debtor and pursue them post-confirmation. R & F would have thirty days after the effective date of the plan in which to assume or reject any executory contracts or unexpired leases (including the Agreement). Hantover filed its timely objection to confirmation of the Bettcher plan.[13]

Hantover's objection raised the following issues. First, Hantover objected to Bettcher's attempt to include exculpatory language releasing itself, its insiders, its attorneys and consultants, and R & F and its counsel from any liability for any acts or omissions in connection with the plan. Second, Hantover complained that the plan did not comply with § 1129(a)(4) because it did not make Bettcher's and R & F's fees and expenses subject to court oversight. Third, Hantover asserted that R & F's intended treatment of the Agreement violated §§ 363, 365, 541, and 1123 and, as such, did not comply with the provisions of Title 11 as required by § 1129(a)(1). At the hearing, counsel announced that the first and second objections were resolved by agreement, but the remaining objections remained for the Court's determination.

Neither party offered evidence at the confirmation hearing, contending that the remaining confirmation issues were purely legal. In the absence of any objections (other than Hantover's), and in light of the announced partial resolution of Hantover's objections, the Court concluded that Bettcher's plan met the requirements of each subsection of § 1129(a) other than § 1129(a)(1). Only one rejecting ballot was filed—Hantover's—while all of the other ballots cast were accepting ballots. As will be discussed below, because Hantover did not have an allowed claim under § 502, it was not entitled to accept or reject the plan under § 1126(a), and its ballot did not count.

*Legal Analysis and Conclusions*

Hantover suggests that Bettcher's plan violates Title 11 because it disregards the provisions of several bankruptcy code sections. Its objections based upon those sections may be summarized as follows. First, Hantover asserts that nothing in the code authorizes R & F acting as a § 1123(b)(3) estate representative to assume or reject an executory contract. Second, Hantover questions the plan provision that grants R & F a thirty day period in which to assume or reject executory contracts. Third, Hantover says that by providing for R & F to acquire the DTS assets "free and clear of all Liens, Claims, and Interests," [14] Bettcher is attempting to acquire the intellectual property in which Hantover claims a perpetual license without regard to Hantover's licensee rights. Hantover also complains that Bettcher's plan makes no provision for the preservation and treatment of Hantover's rights to elect certain treatment as a licensee of a debtor under § 365(n). Fourth, Hantover asserts that Bettcher's delay of the assumption or rejection of its Agreement at confirmation, thereby triggering a termination damages claim under § 502(g), effectively denies Hantover a claim and disenfranchises it as a voting creditor in the case. Finally, Hantover argues that its Agreement is not assumable because it is a nonassignable personal services or financial accommodations contract as referenced in § 365(c).

13. Dkt. 237. Apparently, the term sheet referenced at the disclosure statement hearing in July was not forthcoming from Bettcher.

14. Dkt. 195, Art. 5, p. 8.

## A. *R & F's Power to Assume or Reject*

Hantover first argues that R & F cannot be accorded the power to assume or reject an executory contract under the Code. Hantover bases its contention on the language of § 365(a) which provides that "the *trustee,* subject to the court's approval, may assume or reject any executory contract ... of the debtor." [15] Hantover urges that under the Supreme Court's opinion in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* the plain language of § 365 reserves to the trustee or a debtor in possession wielding the trustee's powers under § 1107(a) the right to assume or reject a contract. [16] In *Hartford Underwriters,* an insurer that provided insurance coverage to a debtor in possession sought to surcharge a bank's collateral under § 506(c). In determining whether an individual creditor had standing to do so, the Supreme Court stated that:

> Because we believe that by far the most natural reading of § 506(c) is that it extends only to the trustee, petitioner's burden of persuading us that the section must be read to allow its use by other parties is " 'exceptionally heavy.' " [17]

The Supreme Court then concluded that only the trustee had the power to seek a § 506(c) surcharge. Hantover would have this Court impose a similar restrictive reading on § 365(a).

This Court notes the absence of case law authority concerning whether a creditor's plan proponent may provide for an estate representative to assume or reject an exec-utory contract. Section 1121(c)(2) expressly allows creditors to propose plans once the debtor's exclusivity period has expired. Section 1123(a) sets out the provisions that must be incorporated into a plan. Among those requirements is the need to "provide adequate means for the plan's implementation" including retention or transfer of all or any part of the debtor's property. [18] Executory contracts are part of the estate's property under § 541. As one court has stated:

> Under this definition, "virtually all property of the debtor" becomes property of the estate. [citation omitted]. "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." [citation omitted] Not surprisingly then, many courts have held that "property" for purposes of § 541 includes executory contracts. [19]

Section 1123(b)(2) states that a plan *may,* subject to the provisions of § 365, provide for the assumption or rejection of executory contracts. And, § 1123(b)(3) states that a plan may not only provide for the adjustment and settlement of any claims or interests of the debtor or the estate, but also that the trustee, the debtor, or a special representative of the estate may retain and enforce such claims or interests. Bettcher's plan provides that R & F shall have all the powers of a § 1123(b)(3)(B) designee and specifically states that the designee shall be "responsible for determining whether to assume or reject the

---

**15.** 11 U.S.C. § 365(a) (emphasis added).

**16.** 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).

**17.** 530 U.S. at 9, 120 S.Ct. 1942, citing *Patterson v. Shumate,* 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) and quoting *Union Bank v. Wolas,* 502 U.S. 151, 156, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

**18.** § 1123(a)(5)(A), (B), and (D).

**19.** *In re National Steel Corp.,* 316 B.R. 287, 311 (Bankr.N.D.Ill.2004) (citations omitted).

Debtor's executory contracts pursuant to the Plan." [20]

The Court concedes that, during the pre-confirmation period, a creditor would not have the power or standing to assume or reject a contract. *Hartford Underwriters* is persuasive on that point. But here, a creditor has filed a plan that materially complies with the mandatory requirements of § 1123(a) and contains some of the discretionary provisions permitted by § 1123(b). If, as Hantover seems to say, a creditor-proponent could not provide in a plan for a plan representative to assume or reject executory contracts, the practical results would be nonsensical. Section 1123(b)(2) would have no meaning in connection with creditors' plans. A creditor proponent would either have to rely upon the debtor, its obvious adversary, to reject any unfavorable or burdensome contracts or the creditor would need to seek the appointment of a trustee in the case, triggering an additional layer of administrative expense and effort in order to propose a liquidation or other alternative to what the debtor has offered the creditor body. The tactical value of a creditor's right to file a plan under § 1121 would be diminished.

■ Section 1123(b)(2)'s language that subjects contract assumption or rejection to § 365 insures that the court has the opportunity to approve the proposed assumption or rejection. Procedurally, there are two avenues to assume or reject an executory contract, either by motion or pursuant to a plan provision under § 1123(b)(2). The rule governing assumption or rejection during the course of a case, Fed. R. Bankr.P. 6006, expressly excludes plan-based assumptions or rejections from its ambit.[21] But a Rule 6006 motion is a contested matter as is the confirmation of a plan.[22] The non-debtor contracting party will therefore receive equivalent due process if its contract is rejected in the plan context as it would under Fed. R. Bankr.P. 6006.

Finally, even the *Hartford Underwriters* court limited its holding concerning the exclusive powers of the trustee to § 506(c) surcharges. In a footnote to the opinion, the Supreme Court stated: ·

*We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c).* [The amicus parties] *draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions,* see 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), *mention only the trustee.* [citation omitted]. *Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today.*[23]

Here Bettcher and R & F do not assert an independent right. Instead they have asked this Court to confirm a plan which would, in part, bestow upon them the right to assume or reject DTS's executory con-

---

20. Dkt. 195, p. 9.

21. Fed. R. Bankr.P. 6006(a).

22. Fed. R. Bankr.P. 9014, 3020(b)(1) and 6006(a).

23. 530 U.S. at 13, n. 5, 120 S.Ct. 1942, emphasis added.

tracts.[24] Because there is no legal or practical reason to limit the assumption or rejection rights of a designee under a creditor's plan, R & F should have that power.

### B. *R & F's Delayed Right to Assume or Reject*

■ Bettcher's plan accords R & F 30 days from the effective date in which to assume or reject DTS's executory contracts.[25] Hantover complains that this delay provision violates the clear meaning of § 365(d)(2) which states that in a chapter 11 case, a trustee must assume or reject an executory contract not later than the conclusion of the confirmation hearing. The timing required by this subsection of § 365 appears to be in conflict with § 1123(b)(2) which plainly provides for the assumption or rejection of contracts in a plan. Collier notes that, under pre-Code practice, courts frequently allowed plans to fix deferred dates to assume or reject contracts.[26] A party may insist that it be heard with respect to assumption or rejection at the time of the confirmation hearing as a party in interest under § 1128(b) to assure adequate protection of its interests.[27]

In this case, the Court directed that R & F state its intention on the record at the confirmation hearing and, after consultation with counsel, R & F announced that it would reject the Agreement, mooting this portion of Hantover's objection to confirmation.

### C. *R & F's Acquisition of Debtor's Intellectual Property: § 363(f) v. § 365(n)*

■ Bettcher's plan provides that, on the effective date, all of the debtor's assets will vest in R & F, "free and clear of all Liens, Claims, and Interests." [28] R & F will satisfy all Allowed Claims in an amount not to exceed the $700,000 distribution cap. The term "Interests" is defined in the plan as "legal, equitable, contractual, or other rights of any Person with respect to DTS Equity Interests." The list of assets to be acquired was set forth on a separate Appendix A.[29] For the purposes of this discussion, to the extent that DTS owned intellectual property, we assume that Bettcher intended R & F to acquire it, free and clear of "Interests." As the definition of that term suggests, "Interests" includes contractual rights and is certainly broad enough to subsume

---

**24.** The Court is also mindful of its authority under § 1142(b) to direct the debtor and "any other necessary party" to perform any act necessary to consummate the plan.

**25.** Dkt. 195, Art. 6, p. 10.

**26.** 7 Collier on Bankruptcy ¶ 1123.02[2] (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. Rev.2006). *See Group of Institutional Investors v. Chicago, M., St. P., and P.R. Co.*, 318 U.S. 523, 551–52, 63 S.Ct. 727, 87 L.Ed. 959 (1943) (railroad reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205).

**27.** *Id. See also In re Cole*, 189 B.R. 40, 46 (Bkrtcy.S.D.N.Y.1995) ("The plan *may* provide for the assumption or assignment of an executory contract. On the other hand, the

contract may 'ride through' the plan as unaffected. However a party to the contract may insist that it either be rejected or fully assumed under the plan if the contract has not already been dealt with separately from the plan. Such party has a right to be heard in respect of affirmation or rejection of the contract at the time of the confirmation hearing under section 1128 or prior to such date, in order to assure adequate protection of its interests.").

**28.** Dkt. 195, Art. 5, p. 8.

**29.** The asset list was separately filed as Dkt. 224 and includes the generic categories of: patents and patent applications, copyrights, trademarks, service marks, trade names, and technology and technological knowledge and advancements.

Hantover's licensee rights under the Agreement. That Agreement affords Hantover the right to manufacture DTS products and to use its copyrighted or trademarked material. The Agreement also provides that Hantover will refrain from manufacturing any DTS products until the distributorship relationship is terminated.

As Hantover points out, R & F's acquisition of the DTS assets can only be characterized as a sale under § 1123(b)(4) and, to the extent the sale is made free and clear of liens and interests, the concepts of § 363(f) governing such sales are implicated. Hantover fears that R & F's acquisition of the DTS assets will be free and clear of Hantover's license rights despite Hantover's right to elect continued use of the debtor's intellectual property under § 365(n). Bettcher, for its part, assures the Court and Hantover that it does not intend to use the § 363(f) "free and clear" powers to eliminate Hantover's license rights.

The parties cited the Court no case law pertaining to the sale of intellectual property free and clear of a licensee's rights under § 363(f) and the Court found no cases that directly bear on this issue. Several courts have considered the effect of a § 363(f) sale on a lessee's rights under an unexpired lease of real estate and reached different conclusions.

The only Circuit Court of Appeals to weigh in on this issue is the Seventh Circuit in *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC.*[30] There, the Court concluded that a § 363(f) sale of real estate extinguished a lessee's possessory rights under § 365(h), holding that the words "any interest" in § 363(f) were suffi-

ciently broad to include rights of possession.[31] The court saw no reason to hold that § 365(h) somehow trumped § 363(f) and reminded the parties that a bankruptcy court always retains the power to prohibit or condition a sale under § 363 as necessary to adequately protect the holder of the affected interest.[32]

A different view of this issue was articulated in *In re Haskell, LP,* where a bankruptcy court concluded, on significantly different legal grounds, that a chapter 11 debtor could not sell real property free and clear of a rejected lessee's possessory interests.[33] In *Haskell,* the court concluded that a sale free and clear could not be approved because the rejected lessee could not be compelled to accept a money satisfaction of its claim as specified in § 363(f)(5). The lessee's claim could not be quantified. The debtor also failed to provide adequate protection of the lessee's interests as required by § 363(e). Stating that § 365(h) declares a Congressional intent to protect the rights of lessees, the court held that allowing a sale free and clear of the possessory interest would allow the debtor to accomplish under § 363 what it was prohibited from doing under § 365(h): dispossessing the lessee. The court denied the debtor's motion to sell.

Subsections (h) and (n) of § 365 apply to very different situations, but are somewhat similar in their approach to treating rejected lessees and licensees. Subsection (h) allows a rejected lessee to remain in possession for the duration of the lease, but excuses the debtor or the trustee from the performance of any other lessor duties under the lease. The lessee may offset against its rent payments any damages caused by the trustee's nonperformance of

---

**30.** 327 F.3d 537 (7th Cir.2003).

**31.** *Id.* at 545.

**32.** *Id.* at 547–48.

**33.** 321 B.R. 1 (Bankr.D.Mass.2005).

those duties. Subsection (n) permits a rejected licensee to treat the licensing agreement as terminated if the rejection would amount to a breach or to retain its rights, including those as relating to exclusivity of use of the intellectual property, for the duration of the agreement. If the licensee elects to retain those rights, the trustee is to allow the use of the property and the licensee shall make appropriate royalty payments as specified in the contract. If the licensee elects to retain its license rights, the trustee shall provide any intellectual property in its possession to the licensee and not interfere with the licensee's rights. Like subsection (h), subsection (n) allows the non-debtor contracting party to retain most of the benefit of its bargain, while attenuating the obligations of the debtor or trustee. Thus, cases interpreting § 365(h) are helpful, if not persuasive, in addressing situations such as this one.

Here, Hantover's complaint that Bettcher seeks the transfer of DTS's assets free of its license interests can be easily resolved by use of the Court's § 363(e) powers to limit or prohibit a sale free and clear of interests to protect those interests. Hantover's interests can be protected by this Court's express order that to the extent DTS' intellectual property is included in the asset transfer, that property is subject to whatever license rights Hantover may have under the Agreement.

■ Hantover's right to effectively utilize the licensed intellectual property does not accrue until the Agreement expires or is terminated. The Agreement has a 10 year term ending June 10, 2013, and DTS's right to terminate before that is scant: DTS may only terminate if Hantover commits a material default while Hantover may terminate at will. Thus, under the Agreement's terms, unless and until Hantover terminates the Agreement, the con-

tract's rejection may not result in a termination under § 365(n)(1)(A), leaving the Agreement in effect and opening to question the degree and extent to which Hantover may make use of the intellectual property it seeks. Hantover's license to use DTS's trademarks and service marks is not protected by § 365(n) at all because trademarks are not "intellectual property" as that term is defined in the Code, § 101(35A).

In short, while some case law suggests that estate property may be sold free and clear of licensee interests, the Court can ameliorate what little harm such a sale would work here by ordering that the transfer to R & F be subject to whatever licensee rights Hantover has in DTS's intellectual property.

### D. Hantover's "Disenfranchisement" at Confirmation

■ Hantover also argues that Bettcher's plan effectively disenfranchised it from meaningful participation in the confirmation process as it relates to Bettcher's plan. Hantover says that, upon rejection of the Agreement, it will have an allowed claim for rejection damages under § 365(g) and § 502(g). By delaying the assumption or rejection to the date of confirmation (or until 30 days thereafter, as Bettcher proposed), Bettcher denies Hantover the ability to determine what its claim might be and, as a consequence, to vote an acceptance or rejection of Bettcher's plan. Hantover also argues that its termination damages will be substantial, having the effect of significantly diluting the distribution to the other unsecured creditors from the $700,000 distribution cap. This, Hantover says, amounts to a material modification of the Bettcher plan that requires it be renoticed under Fed. R. Bankr.P. 3019 or, in the alternative, that the Court should only conditionally confirm Bettch-

er's plan, setting aside that confirmation once Hantover's rejection damages claim is allowed and its negative ballot is determined sufficient to prevent confirmation under §§ 1126 and 1129(a)(8). This argument, like Hantover's others, must also fail.

The Court does not deny that Hantover was placed at a tactical disadvantage when, on the eve of confirmation, the debtor announced it would withdraw its plan. Hantover had actively supported the debtor's position in the acrimonious litigation leading up to confirmation and was seemingly aligned with the debtor. Nevertheless, Hantover was well-aware that Bettcher's likely intent was for R & F to reject the Agreement if Bettcher's plan prevailed. Indeed, Hantover initially raised concerns about the extent of its potential termination damage claims in its objection to Bettcher's disclosure statement when it complained that Bettcher's statement ignored the degree and extent of that as yet unallowed claim.[34] Hantover says it withdrew this objection because Bettcher suggested it might offer Hantover terms upon which R & F would assume the contract.[35] In the six week discovery fracas that followed, Bettcher attempted to conduct discovery on Hantover's potential damage claims. Hantover's discovery responses were less than forthcoming, requiring this Court's intervention on at least one occasion.[36] Added to this, the Court recalls that Bettcher has twice sued Hantover in

the United States District Court for the District of Northern Ohio for alleged infringement of Bettcher's knife patents. One suit remains pending. These parties are old adversaries. In short, Hantover plainly grasped the possibility that it might be left with only Bettcher's plan, that R & F would reject the Agreement, and that Hantover would have damages.

With that knowledge or likelihood, Hantover was not without remedy. At any time in the case, Hantover could have sought the estimation of its termination damage claim by requesting a hearing under § 502(c)(1) and (2). Assuming that Hantover satisfactorily demonstrated those damages, its claim would have been allowed for the purpose of balloting the plan. Fed. R. Bankr.P. 3018(a) contemplates precisely that procedure.[37] Hantover never requested that relief. Because Hantover's claim was never allowed, it could not accept or reject the plan.[38] Its vote did not count in determining whether the unsecured creditors' class accepted the Bettcher plan.

Hantover's suggestion that the allowance of its claim would "blow the distribution cap" does not require that this plan be renoticed under Fed. R. Bankr.P. 3019. The Bettcher plan did not specify that it would pay specific named unsecured creditors certain amounts. Instead, it provided that the unsecured creditors, as a body, would be paid in full or their ratable share

---

34. Dkt. 176.

35. Apparently Hantover's loyalty to DTS is not without limits. Hantover was arguably on notice shortly after the disclosure statement hearing in July that its Agreement would be rejected when Bettcher did not present a term sheet to Hantover as it had previously indicated it would do.

36. Dkt. 245.

37. "...[T]he court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan." Fed. R. Bank. P. 3018(a) (2005).

38. § 1126(a) ( "The holder of a claim or interest allowed under section 502 ... may accept or reject a plan.").

of the $700,000 distribution if the Allowed Claims exceeded the distribution cap.[39] In an ordinary situation, the fact that a large contingent claim's allowance might drastically change what is distributed within a class might persuade a bankruptcy court to require that a plan by renoticed. Here, however, Bettcher owned virtually all of the claims and voted them to accept the plan. Other than Hantover's uncounted ballot, no other non-Bettcher creditor voted. While there may have been objections that Hantover could have made concerning Bettcher's domination of the unsecured class, Hantover did not raise those issues in its confirmation objection.[40] If Hantover has been disenfranchised, it is a result of Hantover's inaction. Without an allowed claim, Hantover simply could not vote. And, without Hantover's vote, the unsecured class unanimously accepted the plan.

### E.  *Other Issues*

■ In its pleadings, Hantover objected that its Agreement was one for personal services or financial accommodation and therefore not assumable under § 365(c). This argument was not addressed at the hearing. The fact that a contract may fall within § 365(c) does not prevent it from being rejected; only assumption and assignment are not allowed.[41] This issue is also mooted by R & F's announced rejection of the Agreement at the confirmation hearing.

### Conclusion

The Court is left with little choice but to confirm Bettcher's plan. The plan was accepted by all voting creditors. As set out above, it conforms to Title 11 and chapter 11's requirements. In the absence of DTS's plan, the only alternative left to the Court would be to convert this case to a liquidation proceeding under chapter 7 and appoint a trustee. This would have the effect of rejecting Hantover's Agreement and would deprive the remaining independent unsecured creditors (along with Hantover, should it prove a claim) the opportunity to participate in the $700,000 distribution paid by R & F. For the reasons set forth herein, Hantover's objection to confirmation is OVERRULED and the Bettcher Plan dated July 10, 2006 is CONFIRMED. Bettcher's counsel shall draw an appropriate confirmation order, consistent with this Order.

---

**39.** Dkt. 195, p. 7.

**40.** Notably, the debtor filed a motion to designate all of Bettcher's owned claims under § 1126(e) in an attempt to protest Bettcher's domination of the process and discount its ballots. Dkt. 250. When DTS withdrew its plan, it withdrew this motion to designate as well, and Hantover did not adopt it.

**41.** *See In re Taylor,* 913 F.2d 102, 106–07 (3rd Cir.1990) ("On its face, the statute places no restriction on a trustee's right to reject a personal services contract. This is not in the least surprising, since, as we read the statute, it implicitly provides that any executory contract which is not assumed—either in the course of the proceedings, or in the reorganization plan approved by the court—is automatically rejected. *See* 11 U.S.C. § 365(q)(1) ... On the other hand, the trustee's authority to reject extends to all executory contracts—including personal-services contracts.").